United States District Court
Northern District of California

UNITED STATES DISTRICT COURT

NORTHERN DISTRICT OF CALIFORNIA

R.P.,

Plaintiff,

v.

CITY AND COUNTY OF SAN FRANCISCO, et al.,

Defendants.

Case No. 24-cv-00522-LJC

**ORDER REGARDING MOTIONS FOR SUMMARY JUDGMENT**

Re: Dkt. Nos. 118, 122

## I. INTRODUCTION

Plaintiff R.P. was one of more than one hundred people, mostly minors, arrested[1] in 2023 in the aftermath of the Dolores Hill Bomb. The Dolores Hill Bomb is an unpermitted, unsanctioned skateboarding event that had been held annually alongside Dolores Park in San Francisco. The event had drawn large crowds of people who gather to watch people skateboard and bike down a steep span of Dolores Street from 20th toward 18th Street. The gathering gained notoriety because of serious injuries, even one fatality, violence, and property damage that occurred in past years. Nevertheless, the event routinely attracted many members of the public, especially young people, to Dolores Street and Dolores Park in the heart of an active San Francisco neighborhood.[2]

[1] In this case and a related class action, *J.T. v. City & County of San Francisco*, No. 23-cv-06524-LJC (N.D. Cal.), Defendants have at times objected to the term "arrest" on the basis that California law distinguishes detention of minors from arrests of adults. This Order uses the term "arrest" in its colloquial sense, which encompasses Plaintiff's involuntary detention, handcuffing, and transportation by police officers. In doing so, the Court makes no finding as to the appropriate classification of that detention under California law.

[2] A City website describes Dolores Park as "one of San Francisco's most popular parks, the vibrant heart of its equally vibrant, culturally diverse neighborhood." S.F. Recreation & Parks, Parks and Facilities, Mission Dolores Park, https://sfrecpark.org/facilities/facility/details/Mission-Dolores-Park-188 [https://perma.cc/H3JY-6S9V].

Plaintiff, who arrived after police had attempted to clear the area of the 2023 Hill Bomb, alleges that he was caught up in an unlawful, indiscriminate mass arrest and he experienced excessive force when officers placed him in excessively tight zip tie handcuffs for hours. Plaintiff brings his claims under 42 U.S.C. § 1983 for violations of the Fourth Amendment to the U.S. Constitution, as well as related claims under state law. Defendants are the City and County of San Francisco, its Police Chief at the time William Scott (now in a similar role with the Los Angeles County Metropolitan Transportation Authority), Captain Thomas Harvey, then-Lieutenant (now Captain) Matt Sullivan, Officer John Solomon, and then-Officer Nelson Wong (now retired), as well as unidentified Doe Defendants.

Both sides move for summary judgment. In essence, a motion for summary judgment is a legal procedure that asks the Court to skip a jury trial, wherein members of the community seated as jurors would decide the claims and defenses by resolving factual disputes about what happened. Instead, the parties ask the Court to enter summary judgment in their favor, i.e., declare the winner in this case. The Court may do so if no reasonable jury could render a verdict in favor of the opposing party given the facts presented. Defendants also assert in their motion that the doctrine of qualified immunity precludes Plaintiff's federal claims from moving forward to trial. The Court held a hearing.[3]

For the reasons discussed below, each party's Motion for Summary Judgment is GRANTED in part and DENIED in part. Based on Plaintiff's non-opposition, Defendants' Motion for Summary Judgment is granted as to Chief Scott, Officer Wong, and the Doe Defendants, as well as Plaintiff's theory of supervisory liability against then-Lieutenant Sullivan. Plaintiff's Motion for Summary Judgment is granted as to Defendants' theory of probable cause based on Plaintiff personally violating certain traffic laws. The Motions for Summary Judgment are otherwise denied.[4] Based on these rulings, the case is narrowed—some claims, defenses, and defendants are dismissed—and the case will proceed to trial where a jury will resolve the issues

---

[3] Defendants also filed a motion to exclude expert opinion evidence, which the Court addresses in a separate order.

[4] The parties have consented to the jurisdiction of a magistrate judge for all purposes under 28 U.S.C. § 636(c).

that remain.

## II. UNDISPUTED DISMISSAL OF CERTAIN DEFENDANTS

Defendant moves for summary judgment on Plaintiff's claims against unidentified Doe Defendants and former San Francisco Police Chief William Scott. ECF No. 122 at, *e.g.*, 19–20, 28.[5] Plaintiff "does not oppose dismissal" of claims against those Defendants. ECF No. 132 at 32 n.1. At the hearing on these Motions, Plaintiff's counsel also conceded that Plaintiff does "not oppos[e] dismissal of Officer Wong." ECF No. 139 at 48:1–2. Defendants' motion for summary judgment is therefore GRANTED as to all claims against Scott, Wong, and Doe Defendants. The summaries and analysis below omit certain arguments and evidence that are relevant only to those Defendants.

## III. BACKGROUND

### A. Evidentiary Record

The following summary is provided for the convenience of the reader. It is not intended as a complete recitation of the evidentiary record or of all relevant evidence that the Court has considered. Some of the evidence discussed below was not specifically addressed in the parties' briefs. "The court need consider only the cited materials, but it may consider other materials in the record." Fed. R. Civ. P. 56(c)(3). The Court has considered all evidence cited by the parties.

#### 1. Captain Harvey's Knowledge of Past Dolores Hill Bombs

Defendant Harvey was promoted to Captain of the SFPD's Mission District in April 2023, after serving in the department for around eighteen years. ECF No. 122-23 (Harvey Decl.) ¶¶ 5–6. Around June 15, 2023, he learned from social media that the Dolores Hill Bomb would take place on July 8, 2023 at 7:00 p.m. *Id.* ¶ 8. He learned from his staff and news reports that the event typically happens annually around that time, that it is "not planned or permitted or sanctioned," that it featured dangerous skateboarding and had resulted in death and serious injuries in the past, and that it had previously "become unlawful and violent," including a 2022 incident where one attendee stabbed another. *Id.* ¶¶ 8–11. Harvey determined "that the best way to protect public

[5] Citations in this Order to documents filed in the case docket refer to page numbers assigned by the Court's ECF filing system unless otherwise indicated.

safety would be to prevent the event from occurring on the steepest part of Dolores Street by blocking access to the Hill in the afternoon, when the event was to take place." *Id.* ¶ 12. In managing the police response, Harvey coordinated with (among others) Defendant Sullivan, who headed the Tactical Company. *Id.* ¶¶ 13–14.

**2. July 8, 2023 Dolores Hill Bomb**

**a. Events Before Plaintiff's Arrival**

Harvey directed officers to set up barricades at a number of cross streets along Dolores Street, stationed Parking Control Officers to prevent vehicles from entering the area, and at about 5:00 p.m. he arrived at Cumberland and Dolores Street. ECF No. 122-23 (Harvey Decl.) ¶¶ 16–19. Officers set up barricades at the intersections of Dolores Street and 18th Street, 19th Street, Cumberland Street, 20th Street, Liberty Street, and 21st Street, nearby on sidewalks, and possibly elsewhere. *Id.* ¶ 19. Dolores Street runs along the eastern side of Dolores Park. *See id.* ¶ 25.[6] "Around 5:30 p.m., people with skateboards approached the Hill and officers told them that the event was canceled and to leave. Some did. However, others stayed, congregating in Dolores Street south of the barricades and in the Park." *Id.* ¶ 20. Harvey states that by 6:30, the crowd had grown to more than two hundred people and had become aggressive, with attendees vandalizing official vehicles, setting off fireworks, breaking bottles, throwing fireworks and bottles at officers, skateboarding dangerously in the crowded areas, and publicly drinking. *Id.* ¶ 21. Harvey directed officers to put on helmets and other protective gear. *Id.* ¶ 22.

Around 7:00 p.m., Harvey received a report that an officer had been slashed in the face and taken to the hospital. *Id.* ¶ 23. Harvey determined at 7:10 p.m. that the crowd was violating multiple sections of the California Penal Code, including some felony offenses, and that the group constituted an unlawful assembly. *Id.* ¶ 24. He began giving orders to disperse over a long-range

[6] The Court takes judicial notice of the following geography relevant to the events at issue: Dolores Park is bounded by 18th Street to the north, Dolores Street to the east, 20th Street to the south, and Church Street to the west. The Muni Metro J-Church line runs along Church Street and the western edge of Dolores Park. 19th Street runs parallel to 18th Street to the south of it, and is interrupted by Dolores Park between its intersections with Dolores Street and Church Street. As one might expect, 17th Street and 16th Street are the next two major east-west streets to the north of 18th Street. Guerrero Street is the next major north-south street to the east of Dolores Street.

acoustic device, or LRAD—essentially a high-powered loudhailer—mounted on a police vehicle, which he states "could be heard over multiple city blocks." *Id.* At Harvey's direction, officers cleared Dolores Street and Dolores Park, with inconsistent compliance from the crowd and continued instances of fireworks, skateboarding, and thrown objects. *Id.* ¶¶ 25–26. To encourage dispersal, a line of officers walked slowly northward on Dolores Street from the barricades towards 18th Street, and officers moving in an echelon slowly walked across the park, directing people to leave. *Id.* ¶¶ 25–26. From 7:30 to 8:03, Harvey remained in a police vehicle in Dolores Park from which he continued to give dispersal orders. *Id.* ¶ 27. There he observed some people continuing to disperse and engaging in the same sort of mayhem, saw a tree near a children's park smoking that he believed would catch on fire, and received a radio report that an officer had been hit in the head with a bottle and taken to the hospital. *Id.* ¶ 27.

Video from police body-worn cameras generally supports Harvey's characterization of these events, though the video also shows additional aspects of how that night unfolded and the police response, which were not covered in detail in the Harvey declaration. Some of these additional aspects are described in certain police declarations.

During the time after Harvey began to issue dispersal orders soon after 7:00 p.m. to about 7:40 p.m., there is video evidence that many individuals remained on Dolores Street in the vicinity of Cumberland and 19th Street, down to 18th Street, and many remained in Dolores Park, as some disturbances continued on Dolores Street. ECF No. 122-64 (Wong Decl.) ¶ 7 (stating that Officer Wong was located with other SFPD officers blocking access to the steepest parts of Dolores Street). Breaking glass can be heard in some of the police videos. *E.g.*, Wong Decl. Ex. 1 at 7:15:32 p.m..[7] Multiple dispersal orders can be heard announcing that an unlawful assembly had

[7] Body camera videos in the record include timestamps in Coordinated Universal Time (UTC), which is seven hours ahead of local Pacific Daylight Time (PDT). Thus, for example, events occurring in the 7 p.m. hour locally appear on the recordings as part of the 2 a.m. hour the following day. *See* ECF No. 122-64, ¶ 7(a) ("This can be seen on my [body-worn camera] at Exhibit 1 (2:10:56-2:12:18) (showing 7:10 to 7:12 PDT)."). This Order cites portions of the body camera videos using Pacific Daylight Time for consistency with the narrative description of events. If a reader wishes to cross-reference these citations with the videos, adding seven hours to the time cited herein will result in the timestamp that appears in the upper right corner of the video.

been declared and that people who did not disperse could be subject to arrest or use of force. *E.g.*, Wong Decl. Ex. 1 at 7:12:11 (declaration of unlawful assembly), 7:16:40 p.m. Attendees did not consistently comply with instructions to disperse. *See*, Wong Decl. Ex. 1 at 7:13:00–7:32:00 p.m.. At times, several in the crowd yelled at the police officers, and a few pushed back against officers, while at other times attendees retreated when ordered by officers to back up, and as the officers advanced in a line down Dolores from Cumberland Street towards 19th Street. *See e.g.*, Wong Decl. Ex. 1 at 7:13:00-7:16:00, 7:28:26 p.m. There were also periods of time when many in the crowd were generally preoccupied with photographing the officers, taunting them, or taking pictures of themselves at the scene. At moments the crowd was jubilant, and skateboarders and cyclists performed tricks at intersection of Dolores and 19th Street. *See*, *e.g.*, Wong Decl. Ex. 1 at 7:17:14 p.m. (depicting someone doing a standing backflip while others film and cheer, with no one particularly close to the line of officers, but most of the crowd not dispersing despite Harvey's audible orders to do so), 7:27:05-7:27:30 p.m. At certain points the crowd was mostly standing around, relatively calm, but remaining on Dolores Street and in the park. *See*, Wong Decl. Ex. 1 at 7:29:05 p.m.; Solomon Decl. Ex. 1 at 7:29:32–30:14 p.m. Fireworks were periodically ignited. Wong Decl. Ex. 1 at 7:16:00, 7:19:40, 7:19:55, 7:30:14 p.m. From about 7:31 p.m. to 7:39 p.m., many of the individuals who had been standing on Dolores Street between 19th Street and 18th Street left. Wong Decl. Ex. 1 at 7:31:00-7:39:00 p.m. From Officer Wong's video it is not entirely clear where the crowd went, but some appeared to have entered the park, where over a hundred onlookers were already gathered. Solomon Decl. Ex. 1 at 7:29:37.

At about 7:40 p.m., Officer Wong's unit moved into Dolores Park. ECF No. 122-64, ¶ 9. Compared to video footage from ten minutes earlier, the crowds of people in the park had mostly dissipated. *Cf.* Solomon Decl. Ex. 1 at 7:29:32–30:14 p.m. Except for walkers, a couple sitting on a bench with infants, and a few others confronted by the officers, the park was largely clear. Wong Decl. Ex. 1 at 7:39:30–40:50 p.m. After these individuals left, Officer Wong's unit continued to the western side of the park, closer to Church Street, and loud disturbances can be heard emanating from Church Street. Wong Decl. Ex. 1 at 7:39:30–7:40:50 p.m.; *see also* Solomon Decl., Ex. 2 at 7:49:50–49:55 (loud explosion as Officer Solomon walks parallel to

United States District Court
Northern District of California

Church Street towards 18th Street). Indeed, multiple officers described chaos unfolding at Church Street, in particular at the intersection of 18th Street. ECF No. 122-45 (Solomon Decl.) ¶¶ 17–19; ECF No. 122-16 (Bates Decl.) ¶¶ 10, 12; ECF No. 122-64 (Wong Decl.) ¶¶ 11–12 & Ex. 2.

By 7:46 p.m. over a hundred people gathered on Church Street, south of 18th Street, to watch skateboarders barrel down its steep slope. Lewis Decl. Ex. 11 at 7:46:00 p.m. Evidently Church Street, which runs along the western edge of Dolores Park, had not been barricaded. In the absence of a police presence, which had concentrated on Dolores Street along the eastern edge of the park, skateboarders had moved to Church Street to bomb that hill. As skaters sped down Church Street, a Muni train was unable to advance across the 18th Street intersection. Eventually a person approached the front of a Muni rail car and tagged it with graffiti. Lewis Decl. Ex. 11 at 7:46:00 p.m. Security video from the Muni light rail vehicle shows a crowd of people covering the vehicle with graffiti, requiring passengers to disembark and the vehicles to remain out of service until police cleared the area around fifteen minutes later. Shaikh Decl. Ex. 2.[8] These incidents appear to have occurred from around 7:45 p.m. to around 8:00 p.m.[9] Security video from another Muni light rail vehicle also shows vandalism and a crowd of people walking in the street. Shaikh Decl. Ex. 1. Both of those videos appear to take place on Church Street.

Harvey saw a group forming in the intersection of 18th Street and Church Street between 7:30 and 7:40, and heard "that the group had started attacking a Muni train near the intersection and that there were reports of gun shots at the intersection." ECF No. 122-23 (Harvey Decl.) ¶ 28. Harvey arrived near 18th and Church Street by 7:50 and saw more than one hundred people standing and skating in the intersection (thus trapping cars that were passing through), graffitiing the Muni vehicle and climbing on its roof, and setting off fireworks near people and vehicles. *Id.* ¶ 29. Harvey continued giving orders to disperse over the LRAD, but the group did not disperse.

[8] Specifically, the multi-camera video file "1502 Vandalism 1945-2035.dvs." Shaikh's Exhibit 2, at least in the form provided to the Court's chambers, also includes a different file consisting of unrelated video of a minor collision between a Muni bus and a car on US-101 in June of 2024.

[9] The internal timestamp for the video indicates that those events occurred from around 6:45 pm to 7:00 pm, though an accompanying declaration states that it is from an hour later than that, which is more consistent with other evidence in the record. ECF No. 122-68, ¶ 4; *see, e.g.*, ECF No, 122-64 (Wong Decl.) ¶ 12 & Ex. 1 at 8:00 (showing a crowd around a light rail vehicle on Church Street).

*Id.* ¶ 30. The police were spread too thin—including responding to "different groups of people acting unlawfully" elsewhere in the area around Dolores Park—to arrest everyone at 18th Street and Church Street, so the officers continued to try to disperse the crowd. *Id.* ¶ 31.

At times, at least some of the original attendees appear to have complied with instructions to disperse. *E.g.*, Wong Decl. Ex. 1 at 7:54:50 p.m. (small groups of people carrying skateboards dispersing north on 19th Street and east on Church Street, as instructed by officers).

At about 7:54 p.m., Wong's unit crossed a footbridge at the middle of Dolores Park on the west side of the park onto Church Street with the intention of clearing Church Street. ECF No. 122-64 (Wong Decl.) ¶ 10 & Ex. 1 at 7:54:25–55:13 p.m. The unit encountered skateboarders and onlookers, as well as passersby trying to navigate the situation. *Id.* Ex. 1 at 7:55:06–55:16, 7:55:33–55:48 p.m. Wong and his unit moved down Church Street toward 18th Street, stopping at Hancock Street, a half block south of 18th Street. *Id.* ¶ 11. Shortly after 8:00 p.m., an officer can be heard saying on the radio that the crowd had become a riot, with an unlawful assembly taking over trains, reports of shots fired, and police "taking barrel bombs." *Id.* Ex. 1 at 8:01:25 p.m. At about 8:02 p.m. his unit ran down the remaining portion of the Church Street slope, charging into the intersection, and clearing the crowd and individuals who had surrounded and climbed onto the Muni train. *Id.* ¶ 14 & Ex. 1 at 8:02:20–03:38 p.m. In the course of doing so, Wong and his unit again encountered people who appeared to be navigating the neighborhood, but otherwise uninvolved in the chaos. *Id.* ¶ 14 & Ex. 1 at 8:03:38–03:48 p.m. As Wong's unit entered the intersection moving north on Church, another line of officers, including Officer Loren Bates, had been standing on the west side Dolores Park and moved into the intersection. ECF No. 122-16 (Bates Decl.) ¶ 14. These officers, along with Bates, followed the group north on Church. *Id.* Bates's body camera shows at least seven SFPD officers on department motorcycles advancing into the intersection ahead of Bates's unit. ECF No. 122-16 (Bates Decl.) ¶ 13 & Ex. 2 at 8:02:35–04:36 p.m. Officer John Solomon's body camera similarly shows numerous SFPD officers on motorcycles following the crowd on Church Street north towards 17th Street. ECF No. 122-45 (Solomon Decl.) ¶ 21 & Ex. 4 at 8:05:41–07:13 p.m.

Someone set off a firework in the street as police approached the graffitied Muni vehicle



United States District Court
Northern District of California

near the intersection of Church Street and 18th Street, and the crowd generally moved north on Church Street. Wong Decl. Ex. 1 at 8:02:45 p.m. The crowd continued to set off fireworks further north. *Id.* at 8:03:55 p.m. Harvey, advancing with other officers, saw fresh graffiti on Muni vehicles, buildings, and a city truck. ECF No. 122-23 (Harvey Decl.), ¶ 33. As the police advanced, some of the crowd continued further north on Church past 17th Street, while others turned right to go east on 17th Street. Wong Decl. Ex. 1 at 8:07:22–7:30 p.m. Police did not block access to prevent people from joining the crowd on Church Street. ECF No. 119-2 at 13–14 (Harvey Dep. at 264:20–265:10).[10]

At his deposition, Harvey testified that his final amplified dispersal order was at 8:00 p.m., while he was still near the middle of Dolores Park, instructing people to leave the area by going north on Church Street. ECF No. 132-2 at 10–11 (Harvey Dep. at 204:20–205:8); ECF No. 119-2 at 11 (Harvey Dep. at 261:7–12). In his declaration, however, he states that he "continued to give amplified dispersal orders until 8:07 p.m., at which point [he] had reached 17th and Church." ECF No. 122-23, ¶ 34.

One important factual question in the case is whether officers reasonably believed that the people they later encircled near Dolores Street and 18th Street and then arrested on 17th Street had been present for the unrest and dispersal orders on Church Street. Harvey was informed around 8:10 that the group from Church Street was "moving east on 16th towards Dolores and that officers at the Dolores and 18th intersection could see the group coming towards them." ECF No. 122-23 (Harvey Decl.) ¶ 35; *see also* ECF No. 122-64 (Wong Decl.) ¶ 17 ("While I was at 18th and Dolores, I observed the group coming south on Dolores toward the intersection."). At about 8:12 pm Wong was informed that the group he had been following from the Church and 18th Street intersection was doubling-back sound on Dolores Street towards the Hill. ECF No. 122-64 (Wong Decl.) ¶ 12. Wong's declaration does not include observations of the group turning east

[10] Plaintiff asserts that the City's Rule 30(b)(6) witness Sgt. Justin-Paul Bugarin testified that outsiders' access to a group should be restricted before a mass arrest, but Bugarin made clear during his deposition that he was referring to steps that should be taken after the mass arrest, during detention, when police should determine who should and should not continue to be detained. ECF No. 131-2 at 7–9 (Bugarin Dep. at 24:21–26:6).

onto 16th Street and his body camera video ends at 8:10 p.m. Bates followed the group up Church a little past 17th Street, and was informed around 8:12 p.m. that the group was doubling back towards Dolores and 18th Street. ECF No. 122-16 (Bates Decl.) ¶ 16. Sergeant Murray Daggs's precise location between 8:00 p.m. and 8:15 p.m. is not clear, but he states in a declaration that he believed the group at 18th and Dolores at 8:16 p.m. was very likely the same group that participated in the riot earlier that day. ECF No. 122-27 (Daggs Decl.) ¶ 9. Daggs drew that inference "[b]ased on [his] experience and training, and [his] familiarity with the neighborhood and community," but did not attest that he personally observed the group from Church and 18th Street move down 16th Street and arrive at Dolores Street. *Id.* Sullivan states that he followed the crowd on Church to 16th Street, observed it turning onto that street, and soon thereafter heard a report on the radio that another officer "could see the group coming southbound on Dolores from 16th." ECF No. 122-25 (Sullivan Decl.) ¶¶ 22–23. Sullivan then ran to the intersection of 18th Street and Dolores Street, where he "could see the group re-forming." *Id.* ¶¶ 24–25.

**b. Plaintiff's Arrival and Crowd Activity at 18th and Dolores**

Plaintiff R.P.,[11] who was fifteen during the events at issue and lived in San Mateo, started skateboarding when he was in eighth grade. ECF No. 119-4 at 16–17, 20 (Pl. Dep. at 14:25–15:18, 18:1–2). He used to skateboard with some friends from school whom he knew only by their first names, including a friend named L. who went with him to the 2023 Dolores Hill Bomb. *Id.* at 21–22 (Pl. Dep. at 19:8–20:18). Plaintiff had never been to Dolores Park before the events at issue or participated in a previous hill bomb, though he had seen videos of them on YouTube, and had heard about the event from friends. *Id.* at 41, 52–53 (Pl. Dep. at 39:1–6, 50:23–51:17). He talked to his parents about the event in 2023 a "couple weeks before it" and they agreed that he could go. *Id.* at 57 (Pl. Dep. at 55:6–17). They instructed him to "go straight there and nowhere else," to text them when he arrived and left, and to leave by 9:00 p.m. at the latest. *Id.* at 67 (Pl. Dep. at 65:9–18). They also told him to leave if he saw any violence or "bad actions," or if anyone told him to. *Id.* at 68 (Pl. Dep. at 66:2–20).

[11] Consisted with Rule 5.2(a) of the Federal Rules of Civil Procedure, this Order refers to R.P. (a minor) and his friend L. (presumably also a minor) only by their initials.

On the day of the event, Plaintiff and L. had previously been at a quinceañera in South San Francisco. ECF No. 119-4 at 69, 75 (Pl. Dep. at 67:18–22, 73:1–6). They took Caltrain to 22nd Street and skateboarded west from there to the event, where Plaintiff did not intend to skate down the hill, but instead only wanted to watch other people. *Id.* at 39–40, 58–59 (Pl. Dep. at 37:11–38:6, 56:17–59:15). It took them about half an hour to get from the train station to the vicinity of Dolores Park, specifically the intersection of 18th Street and Dolores Street. *Id.* at 74 (Pl. Dep. at 72:3–8). At 8:07 p.m.—the last point when Harvey may have given an amplified order to disperse, ECF No. 122-23, ¶ 34—geolocation data from a video Plaintiff took indicates that he was on or near Pennsylvania Avenue between 18th Street and 19th Street, just under two miles away from Dolores Park. ECF No. 119, ¶¶ 7–8 & Exs. 6–7. Plaintiff testified that he arrived around 8:27 p.m., and that he knew the time because he took a video within "no more than two minutes of being there." ECF No. 119-4 at 76–77 (Pl. Dep. at 74:24–75:6).

Shortly before Plaintiff arrived, the area near the intersection of 18th Street and Dolores Street was crowded, with some people standing on the southeast corner near the Dolores Park Cafe, some in the crosswalk of 18th street on the east side of the intersection, some east of the crosswalk standing or briefly skateboarding on the south side of 18th Street, some on the sidewalk at the northeast corner of the intersection, and others passing through from west, north, and east. Rhodes Decl. Ex. 1; Daggs Decl. Ex. 1; Bates Decl. Ex. 3; Solomon Decl. Ex. 11.[12] A line of police officers had blocked off Dolores Street to the south, and police were directing traffic through the intersection, generally directing cars that approached from the north on Dolores Street to turn around and go back the way they came. Vehicular traffic occasionally passed through from the east on 18th Street and turned right to go north on Dolores, seemingly slowed but not blocked by the crowd. People who had no apparent connection to or interest in the gathering sometimes passed between the police officers and the crowd, including two eastbound people carrying what appear to be bags of takeout food (Rhodes Decl. Ex. 1 at 8:20:13 p.m.), an eastbound person walking a small dog (*id.* at 8:23:33 p.m.), a westbound man in shorts and woman in a light blue

[12] Factual descriptions below regarding events at the corner of 18th Street and Dolores Street are derived from these video recordings unless otherwise indicated by citations to other evidence.

United States District Court
Northern District of California

jacket who passed between a few teenagers and police officers while those teenagers were standing close to the officers (Solomon Decl. Ex. 11 at 8:25:45 p.m.), and an eastbound couple dressed somewhat more formally than most of the Hill Bomb attendees (Solomon Decl. Ex 11 at 8:29:30 p.m.). Contrary to police declarations that the group of teenagers prevented travel on the sidewalk, none of those people appear to have had any meaningful difficulty navigating through the crowd.

Harvey initially observed the crowd gathering at 18th Street and Dolores Street, and believed it to be the same group as police had previously routed from Church Street based on observations that the group had moved that direction and similar activity like "walking and skating in the street, blocking traffic." ECF No. 122-23, ¶ 38. He did not think it likely "that an unrelated unlawful assembly formed 20 minutes and one block away from the one at 18th and Church." *Id.* ¶ 38(c). He saw bystanders at the intersection who "watched from afar or left the area," but he expected "that a reasonable person who came across the group at 18th and Dolores, saw how they were behaving, and the large police presence at the intersection, would leave immediately and not join or stand closely with the group." *Id.* ¶ 39. Around 8:23, Harvey left that intersection and walked south on Dolores Street to a position between 18th Street and 19th Street, because "some of the group" had also gathered at 19th Street. *Id.* ¶ 40.

Around 8:25 p.m., a small group of people at the corner of 18th Street and Dolores Street—probably less than ten of them, and apparently mostly teenage boys—started antagonizing the police officers who were blocking Dolores Street. That small group yelled insults and profanity, and disregarded or only intermittently complied with instructions to back up. At least one, possibly more individuals used racial slurs.[13] Some of the boys at times stood close to the police officers while others took pictures of them extending their middle fingers towards the offices. Some of them threatened officers, saying things like "I'll beat your ass" and "you should

---

[13] Defendants assert that the teenagers called officers "racial slurs" and the "N-word" multiple times." ECF No. 122 at 16–17, 22–23 & n.6; ECF No. 122-38, ¶ 21. Though Defendants point to these words, and the video evidence confirms to some degree their use (but not necessarily racial animus directed at the officers), Defendants do not contend that this speech was the basis for the mass detention.

be afraid of us." Some of their threats, though crude and offensive—e.g., "I'll fuck your daughter, bitch," Bates Decl. Ex. 3 at 8:26:06 p.m.—did not describe actions they could have literally carried out during the confrontation. The boys did not physically attack the officers. *See* ECF No. 122-16, ¶ 20. ("Members of the group would also rush up, nearly touching us."). Even during this confrontation, a couple of apparent bystanders passed between the teenagers and the police officers, walking west on 18th Street seemingly unobstructed. Solomon Decl. Ex. 11 at 8:25:42 p.m.; Rhodes Decl. Ex. 3 at 8:25:42 p.m.

Officer Loren Bates's recording depicts Plaintiff skateboarding westbound on 18th Street at 8:35:38 p.m., on the south side of the street (i.e., the side for eastbound traffic) near the sidewalk. There was no eastbound vehicular traffic on 18th Street at that time or through most of this period. Upon arrival, Plaintiff appears in police body camera footage near the confrontation outside Dolores Park Cafe starting around 8:26 p.m.

Coincidentally, Harvey "ordered encirclement of the group on the east side of 18th and Dolores" almost immediately after Plaintiff's arrival, at 8:27. He did not consider giving another order to disperse, because he believed "the time for 'I'm asking' was over once the riot happened" and did not think reasonable people would have joined the crowd at that time. ECF No. 119-2 at 20–21 (Harvey Dep. at 277:22–278:21).

When Plaintiff arrived at the corner, he—like most of the people in the immediate vicinity—stood somewhat further back from the officers than the people antagonizing them, did not speak to the officers, and does not appear to have spoken to the people antagonizing them. Many of the people present, including Plaintiff, filmed the scene or took pictures with cameras or smartphones. Plaintiff stood near the edge of sidewalk on the corner. He occasionally stepped backward into the street but immediately returned to the sidewalk each time. He carried a skateboard and spoke to one other person, apparently his friend L., who similarly stood on the sidewalk near the curb.

Plaintiff took at least one video of the confrontation, in which Plaintiff or someone near him can be heard saying something like "this nigg* got rousing them bro" (or perhaps "got rounds in him") as a teenager taunted the police officers. Lewis Decl. Ex. 3. Plaintiff testified that he and

United States District Court
Northern District of California

L. stayed in the area for around five minutes, "figuring out what was happening and if [they] should leave." ECF No. 119-4 at 83 (Pl. Dep. at 81:18–24).

Around 8:28 p.m., police let someone in a wheelchair pass from the south on Dolores Street through their line to the crowd on the corner, and a few people in the front of the crowd celebrated as if they knew the person in the wheelchair. Plaintiff stayed further away on the corner and did not join that brief celebration.

Around 8:29 p.m., officers' recordings show that Plaintiff stepped into the crosswalk where others were also standing, slowly crossed the street to the north (away from the police officers) after a Muni bus passed through the intersection from the east, and sat on the curb at the northeast corner of the intersection. The light was red when Plaintiff crossed the street, though the police appear to have been directing traffic through the intersection to make U-turns on Dolores Street without regard for the phase of the stoplight. Plaintiff does not appear to have blocked any vehicles while he crossed, but a silver car traveling east slowly entered 18th Street just after he crossed. Plaintiff and L. then sat on the curb at the northeast corner of the intersection, and Solomon's recording shows them there for around a minute watching the commotion.

Around 8:30 p.m., police officers can be heard in Bates's video recording shouting "fireworks," and some in the crowd moved quickly to the east on 18th Street. At 8:30:17 p.m. in Sergeant Daggs and Officer Solomon's recordings, an officer can be heard saying "shoot the next guy who throws one." Daggs then said to another officer (possibly Solomon), "You saw that right? They just threw a barrel bomb."[14] According to Officer Rubin Rhodes, another officer "was able to disable" the firework. ECF No. 122-38, ¶ 23. Apparent bystanders continued to pass through the area, including an older man with a scarf and backpack at 8:30:31 p.m. in Solomon's recording.

---

[14] The parties in the related class action agreed at a hearing that there is no evidence indicating that the term "barrel bomb" as used during the events at issue referred to something other than a type of firework, and no party in this case suggested otherwise. *See J.T.*, No. 23-cv-06524-LJC, ECF No. 322 at 35:5–13. The Court makes this distinction not to minimize officers' legitimate concerns regarding any sort of explosive detonated on city streets, but only to avoid potential confusion when the same term can also refer to highly lethal and indiscriminate weapons of war.

**c. Plaintiff's Departure from 18th Street and Subsequent Arrest**

Plaintiff testified that he and L. heard something like a gunshot, saw people running, and decided to leave. ECF No. 119-4 at 83–84 (Pl. Dep. at 81:25–82:7). According to Plaintiff, he and L. started to go "[b]ack down the street [they] came up"—apparently 18th Street—in the same direction as the crowd, because that was the direction back to the train station. *Id.* at 84, 86 (Pl. Dep. at 82:8–9, 84:18–23). He also noted that police were blocking Dolores Street and further westbound progress on 18th Street, and that they had been telling people to stay back. *Id.* at 84–85 (Pl. Dep. at 82:24–83:8). Plaintiff and L. made it less than "a quarter of the block" before the crowd "started coming back up the street." *Id.* at 89 (Pl. Dep. at 87:3–14). As the crowd passed them, Plaintiff and L. went back to the corner, and saw police officers walking behind them. *Id.* at 96 (Pl. Dep. at 94:3–12). With police in all other directions, Plaintiff and L. then went north on Dolores Street for lack of any other apparent option. *Id.* (Pl. Dep. at 94:14–18).

That testimony is mostly consistent with police video, though Plaintiff does not appear to have traveled meaningfully to the east (the direction from which he arrived). Solomon's recording shows that Plaintiff and L. stood up from the curb around 8:30 and walked to stand closer to the building at the northeast corner of the intersection. Daggs, Bates, Solomon, and briefly also Rhodes's recordings show them standing there. At 8:30:37 p.m. in Bates's recording, Plaintiff and L. are some of the only people still near the intersection, standing by themselves on the sidewalk when most of the crowd has moved farther east. Beginning around 8:30:45 p.m., Daggs and Solomon's recordings (as well as the very end of Bates's recording) show the crowd starting to rush back west on 18th Street and turn the corner north on Dolores Street, both on the sidewalk and in the street. The video does not show officers approaching from the east, but Sullivan states in his declaration that he and other officers did so as part of an effort "to encircle the group," and officers approaching outside the frame of the video might explain the crowd turning and running to the west. ECF No. 122-25, ¶ 29–30. At 8:31:02 p.m., Plaintiff and L. appear to have started walking north on the sidewalk in the same direction as the crowd. The line of officers then crossed 18th Street to the north, following the crowd. The body camera recordings in the record of the case do not show Plaintiff again until significantly later, after he and others had been

arrested on 17th Street.

Officer Solomon and Sergeant Daggs state in their declarations that there were people present who did not appear to be part of the same group. For example:

- "Pedestrians not associated with the group were also moving in that direction [i.e., east]. It was obvious they were not in the group because they were walking at their own pace, obeying traffic laws (not walking in the street) and were not staying closely huddled with the group, and had not been standing and acting alongside the group." ECF No. 122-45 (Solomon Decl.) ¶ 44.
- "Others present who were not in the group stayed where they were as the group ran by [north on Dolores Street], or continued walking east on 18th." *Id.* ¶ 45.
- "There were many other pedestrians on the north side of the street who were on the outside of our line. I understood this to be because we were focused on preventing the group from running back South on Dolores toward the hill." *Id.* ¶ 46.
- "I saw people walk through the intersection at 18th and Dolores Street at this time and not stop and not stand with the group. I understood them not to be a part of the group. My observation at the time this BWC was recorded was that they were just pedestrians trying to get through the area." ECF No. 122-27 (Daggs Decl.) ¶ 22.

To the extent the officers suggest that people who did not voluntarily move with the crowd were not subject to arrest, that does not appear to be entirely consistent with the video evidence. Around 8:30:58 p.m., as people continued rushing by on the opposite side of the street from police officers, a girl or young woman can be heard on Rhodes's recording calmly inquiring about passing the officers south on Dolores Street because "our [unintelligible] is that way." She and a companion are visible on Solomon's recording talking to the officers and gesturing west and south. Officers directed them north on Dolores Street with the crowd, despite their stated desire to go elsewhere. Around 8:33:08 p.m. in Daggs's recording, officers seem to have ordered a group of people who had stayed on the northeast corner of Dolores Street and 18th Street, rather than moving north with the crowd, to follow the crowd north on Dolores Street. The record is not sufficient to say with certainty whether those people were ultimately arrested on 17th Street, but in

the absence of evidence to the contrary, a finder of fact might reasonably infer that they were.

On the other hand, officers allowed at least one person wearing a black jacket and khaki pants to cross south on 18th Street away from the crowd as the officers crossed north, and they allowed at least one person wearing a pink sweatshirt and black pants who was standing on the street on the south side of 18th Street at that time to remain there. Solomon Decl. Ex. 11 at 8:31:15 p.m. Officers' reasons for requiring some but not all of those people to move north with the crowd are not apparent from the evidentiary record.

Plaintiff testified that some of the crowd continued north on Dolores Street[15] and others turned onto 17th Street. ECF No. 119-4 at 98–99 (Pl. Dep. at 96:22–97:13). Plaintiff and L. took 17th Street "because [they] were trying to go home or back to the Quinceañera," *id.*, and that was the direction to the train station, *id.* at 106 (Pl. Dep. at 104:3–8). He testified that he did not turn off Dolores Street onto the smaller side streets Dorland Street and Dolores Terrace, because the former "looked like just an alley" and he could see police officers at the other end of it, and the latter was not a through street. *Id.* at 105–06 (Pl. Dep. at 103:15–104:2).

Meanwhile, Harvey had "directed officers on motorcycles to go set up a line to cut off north and west-bound access on 17th, directing the group east," and sent "another line of officers to block the other end of the block, at Guerrero and 17th." ECF No. 122-23, ¶ 43. Around 8:34:30 p.m. in Daggs's recording, someone can be heard on the radio saying, "So the group's posted up 18th, uh, 17th and Dolores right now. We're going to try to choke them in." At 8:36, Harvey "heard over radio that the group was primarily on the southeast corner of . . . 17th and Dolores," and he "directed officers to encircle the group there." ECF No. 122-23 ¶¶ 44–45. Police officers corralled Plaintiff and L. with "about a hundred" people on 17th Street between Dolores Street and Guerrero Street around 8:40 or 8:50. ECF No. 119-4 at 98–99, 106 (Pl. Dep. at 96:3–8, 97:20–25, 104:9–15). Sullivan, who was involved with the encirclement and arrest, testified that he "recognized everyone as being part of the group" that police had pursued around several blocks, "just as one big - - one big group all together," including Plaintiff because he was

[15] The record does not make clear what happened to people who continued north past 17th Street.

part of the group that was arrested. ECF No. 131-3 at 5–7 (Sullivan Dep. at 23:7–25:11). He testified that prior to the arrest, when police officers were "marching around chasing this group," he instructed officers not to detain some people he believed lived in the area. *Id.* at 8 (Sullivan Dep. at 26:2–17).

Harvey testified at a deposition that officers "had to rely on their judgment, their training, their experience, and their observations from the day" to distinguish "bystanders" from the "group" that was subject to arrest. ECF No. 119-2 at 6 (Harvey Dep. at 224:12–17). He testified that neither age nor possession of a skateboard meant that someone was in the "group" and subject to arrest. *Id.* at 6–7 (Harvey Dep. at 224:18–225:3). Harvey does not appear to have provided any guidance, either during the events in question or at his deposition, as to how officers should determine who from among the crowd should be arrested and who should be allowed to leave. *Id.* at 8–9 (Harvey Dep. at 235:17–236:8). The San Francisco Police Department did not train him in how to make that sort of determination. *Id.* at 17–18 (Harvey Dep. at 273:18–274:20). Harvey testified that entering an area of police activity like the corner of 18th Street and Dolores, taking pictures, and witnessing others' conduct would not in itself be an arrestable offense. *Id.* at 19–20 (Harvey Dep. at 276:8–277:12). Sullivan, when asked what steps were taken to separate bystanders from those who were involved in criminal activity, testified that he believed everyone who was arrested "was a part of the riot and failed to disperse." ECF No. 119-3 at 6 (Sullivan Dep. at 27:9–25).

Defendants' police practices expert Howard Jordan testified that someone who arrived at the corner of 18th Street and Dolores Street at 8:25 p.m. and took pictures and videos would not be "a participant in an unlawful assembly" unless "they were involved in some kind of criminal activity and they were refusing to leave" after being ordered to disperse. ECF No. 119-9 at 4–5 (Jordan Dep. at 56:10–57:1). A witness testifying for the City under Rule 30(b)(6) testified that a bystander who hypothetically entered an area after an unlawful assembly had been declared, but who did not hear that declaration, would not have committed a crime or be subject to arrest. ECF No. 119-10 at 5–6 (Bugarin Dep. at 70:22–71:14).

Plaintiff testified that he never heard any instructions or warnings to leave, or instructions

for exit routes from the area, or anyone talking about such instructions. ECF No. 119-4 at 101, 104 (Pl. Dep. at 99:19–24, 102:10–24). No such instructions are audible in the police recordings from the period when Plaintiff was present, and Defendants do not assert that any such instruction was given at that time. Plaintiff testified that he did not see any spray painting or vandalism and did not know that had occurred. ECF No. 119-4. at 104–05 (Pl. Dep. at 102:25–103:10). He only spoke to one "random person" besides L. before his arrest, who told Plaintiff that he did not know what had happened. *Id.* at 101 (Pl. Dep. at 99:3–18).

Harvey testified that he did not have any recollection of seeing Plaintiff or witnessing him commit any crime. ECF No. 119-2 at 22 (Harvey Dep. at 286:3–19). Solomon testified that he did not recall witnessing Plaintiff commit violence or vandalism. ECF No. 119-8 at 3 (Solomon Dep. at 22:7–16).

#### d. Plaintiff's Detention

At some point after dark, Plaintiff took a video of his friend L. and other people doing tricks on skateboards while they were cordoned on 17th Street by police, and Plaintiff announced to the officers that L. had done a trick for them. Lewis Decl. Ex. 9. Plaintiff testified that he also took a video around 9:30 or 10:00 p.m., in which a police officer confirmed that Plaintiff was being detained and told him that it was because skateboarding was illegal in San Francisco, but that video does not appear to be in the record currently before the Court. ECF No. 119-4 at 107–08 (Pl. Dep. at 105:12–106:11).

At 12:32 a.m., officers asked Plaintiff how old he was (fifteen), took his skateboard, and told him he was under arrest. Wong Decl. Ex. 3. At 12:34, Wong instructed Plaintiff to place his hands behind his back and applied plastic handcuffs (effectively, two large zip-ties). *Id.* Wong told Plaintiff to keep the backs of his hands together, thus minimizing the space between his wrists, and then tightened each cuff until minimal space was visible. *Id.* Plaintiff cooperated and did not say anything in response. *Id.* Plaintiff testified at his deposition that the handcuffs hurt from the moment they were put on, but he did not know that he could ask for them to be adjusted or otherwise do anything about it. ECF No. 119-4 at 127 (Pl. Dep. at 125:7–24). Wong testified that he handcuffed Plaintiff because he was the next person in line, and did not indicate that he had

specific reason to arrest Plaintiff beyond his simply being part of the group that had been detained. ECF No. 119-7 at 3–5 (Wong Dep. at 37:23–39:21).

Other young detainees were lined up against a building. Wong Decl. Ex. 3. An officer walked Plaintiff to the end of the line, where Solomon was stationed. Solomon Decl. Ex. 18 at 12:36:50 a.m.[16] After a little while, Plaintiff and Solomon made intermittent cordial small talk during Plaintiff's detention on the street, such as Plaintiff asking Solomon about his views on skateboarding. Solomon Decl. Ex. 18 at 12:38, 12:46–12:47 a.m. During the first of those conversations, Plaintiff said that the handcuffs were cutting off his circulation, but Solomon did not acknowledge that statement and continued to talk about the events of the day, including reports of people shooting guns and setting trees on fire. *Id.* at 12:39 a.m. Plaintiff responded to Solomon's description ("So that's what it's about. I get it.") and did not immediately raise further complaints about his handcuffs. *Id.* They continued to talk about previous Dolores Hill Bombs, with Plaintiff stating that his mother had not let him attend the previous year, and Solomon stating that people had died in recent years. *Id.* Plaintiff's friend L. then arrived, interrupting their conversation as he asked Solomon to help tuck his hair away from his face. *Id.* at 12:40 a.m. Solomon reluctantly helped him, and the three of them laughed about it. *Id.*

Around 12:47 a.m, a different boy standing near Plaintiff asked Solomon to put "real handcuffs" on him because the plastic cuffs hurt. Solomon Decl. Ex. 18. Solomon responded, "If you weren't out here, you wouldn't be in them." *Id.* The boy said that was his point, and he wanted to leave. *Id.* Solomon referenced the dispersal orders, and Plaintiff joined the conversation to say he had just arrived and had been trapped by the police lines. *Id.* Solomon said that the arrest would be a life lesson. *Id.* The other boy continued to complain about pain from

[16] Solomon's declaration, and Defendants' references thereto in their briefing, refer to these events occurring one hour earlier than recounted in this Order. But the UTC timestamp on the video supports the timeline stated here (adjusted by seven hours to PDT), which is also consistent with Wong's declaration and Defendants' assertion in their motion that Wong first began processing arrestees (including by handcuffing them) around 11:47 p.m.. ECF No. 122-64, ¶¶ 21–22; ECF No. 122 at 17. At 08:17:50 according to the video timestamp (1:17 a.m. according to the timeline used in this Order), some of the people in the video state that the time is 1:25. Solomon Decl. Ex. 18. Solomon also refers to portions of the detention occurring during the 12 p.m. hour, where he presumably intended to write a.m. ECF No. 122-45, ¶¶ 57–58. These discrepancies are not relevant to the outcome of the present Motions.

his handcuffs, and around 12:48 a.m., Plaintiff said that he could not feel his hands. *Id.* The other boy asked if Solomon wanted him to "lose [his] hands," to which Solomon did not respond. *Id.*

Solomon and the boys resumed small talk, with the boys asking, for example, whether he had used various weapons in the line of duty. *Id.* Later, around 12:52 a.m., the boy who had complained about his handcuffs talked to Solomon about how much money he made, whether Solomon would leave his job with the police to work as security for the boy if the boy became famous, and the poverty line in San Francisco. *Id.* The tone of the conversation was generally light.

At 12:55 a.m., when that boy was wincing in apparent pain, Solomon asked him to face the building so Solomon could check his cuffs. Solomon checked the cuffs, laughed, and said, "Dude, those things are so loose. You gotta do better than that." *Id.* Plaintiff asked Solomon to check his cuffs too, saying that his left hand was alright but the cuff on his right hand was so tight that he could not feel his hand. *Id.* Solomon states in his declaration: "I checked Plaintiff's flex-cuffs pursuant to my training by placing my finger into the space between the cuffs and his wrists, pursuant to my training. I determined that the flex-cuffs were appropriately tight and told him this." ECF No. 122-45, ¶ 45. The video shows that Solomon briefly checked Plaintiff's cuffs, said that the "pass is alright," and did not adjust them. Solomon Decl. Ex. 18.

Solomon then resumed small talk with the other boy, who continued asking about his experience as a police officer. *Id.* Later, around 1:00 a.m., Plaintiff asked Solomon if Plaintiff would be able to see his own mugshot. *Id.* Plaintiff remains visible on Solomon's video recording for most of the next twenty-five minutes, standing or pacing next to a building in a line of other detained boys. *Id.* Around 1:25 a.m., police directed Plaintiff and the other boys near him onto a Muni bus, still handcuffed. *Id.*

Around 1:29 a.m., Solomon said to some of the boys on the bus: "I appreciate you guys being chill for the most part." After a pause, Solomon stated: "So we gotta do a statement, for the 849(b), and I'm gonna see if we can cut the investigative detention tomorrow. I don't know what they'll say, but I'm gonna see if we can just do that." *Id.* It is not clear whether that second comment was directed to the detainees or to someone off camera.



United States District Court
Northern District of California

Officers directed Plaintiff and his friend to leave the bus at 1:36 a.m., and officers walked them through the Mission police station parking lot. *See* Solomon Decl. Ex. 18. Plaintiff testified that he was held for "another hour in an outside boarding cell . . . until 4:00 AM [sic]." ECF No. 119-4 at 112 (Pl. Dep. at 110:6–10); *see also id.* at 130 (Pl. Dep. at 128:24–25) ("They just put is in an outside cell with no roof."). He was then processed in the police station, which entailed cutting off his plastic handcuffs, giving him a citation, and having him "fill out [his] information." *Id.* at 131 (Pl. Dep. at 129:4–8).

Plaintiff testified that the plastic zip-tie-style handcuffs "hurt[] more than regular handcuffs because your hands are crossed," and that his "hands were like purplish" as a result. *Id.* at 112 (Pl. Dep. at 110:16–21).[17] He later clarified that his view of the relative pain of plastic versus metal handcuffs was based on a Google search, talking to other people, and his past experience with a Halloween prop that resembled handcuffs. *Id.* at 124–26 (Pl. Dep. at 122:9–124:8). According the Plaintiff, he remained in handcuffs "for about three and a half hours," *id.* at 112 (Pl. Dep. at 110:16–17), or "[a]bout two and a half hours to three," including an hour to an hour and a half at the police station, *id.* at 126 (Pl. Dep. at 124:9–25). According to Plaintiff, his injuries from the handcuffs included bruising around both wrists, loss of feeling in his fingers, and sore shoulders for about a week. *Id.* at 131–33 (Pl. Dep. at 129:9–131:8).

**B. Claims Asserted**

Plaintiff asserts the following claims for relief: (1) excessive force under 42 U.S.C. § 1983 against Defendants Wong and Solomon, 2d Am. Comp. (ECF No. 57, SAC) ¶¶ 34–36; (2) false arrest in violation of the Fourth Amendment, under § 1983, against Defendants Wong, Harvey, and Sullivan, SAC ¶¶ 37–40; (3) "Supervisor Liability" against Defendants Harvey and Sullivan, SAC ¶¶ 41–44; (4) violation of the Bane Act, codified at section 52.1 of the California Civil Code, against Defendants the City, Harvey, Sullivan, and Solomon, SAC ¶¶ 45–52; (5) battery, in violation of California Penal Code § 242, against Defendants the City, Wong, and Solomon, SAC

[17] Plaintiff also testified that officers cut his hand when they removed the plastic cuffs with scissors, but he does not appear to be pursuing claims based on that injury. *See* ECF No. 119-4 at 112 (Pl. Dep. at 110:22–23); *cf.* ECF No. 132 at 29–30 (not addressing the cut in Plaintiff's opposition to Defendants' motion for summary judgment).

¶¶ 53–56; (6) negligence, against all Defendants, SAC ¶¶ 57–63; and (7) false imprisonment and arrest, against Defendants the City, Harvey, Sullivan, and Wong, SAC ¶¶ 64–67.

## IV. LEGAL STANDARD

To prevail on a motion for summary judgment, a movant must "show[] that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a).

> In considering a motion for summary judgment, the court must examine all the evidence in the light most favorable to the non-moving party. *United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). At the summary judgment stage, the court does not make credibility determinations or weigh conflicting evidence. *See T.W. Elec. Serv., Inc. v. Pac. Elec. Contractors Ass'n*, 809 F.2d 626, 630–31 (9th Cir. 1987). However, once the moving party meets the requirements of Rule 56 by showing there is an absence of evidence to support the non-moving party's case, the burden shifts to the party resisting the motion, who "must set forth specific facts showing that there is a genuine issue for trial." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 256 (1986).

*Porter v. Cal. Dep't of Corr.*, 419 F.3d 885, 891 (9th Cir. 2005).

Accordingly, the Court draws all reasonable inferences in favor of Plaintiff for the purpose of Defendant's motion for summary judgment, and all reasonable inferences in favor of Defendant for the purpose of Plaintiff's motion.

On summary judgment, the Court must consider whether the *contents* of evidence offered by the parties would be admissible at trial, even if evidence is not currently offered in a *form* that would be admissible. *See Fraser v. Goodale*, 342 F.3d 1032, 1036–37 (9th Cir. 2003).

## V. ANALYSIS

### A. Unreasonable Seizure and False Arrest Claims

The Fourth Amendment to the U.S. Constitution prohibits "unreasonable . . . seizures." U.S. Const. amend. IV. "In conformity with the rule at common law, a warrantless arrest by a law officer is reasonable under the Fourth Amendment where there is probable cause to believe that a criminal offense has been or is being committed." *Devenpeck v. Alford*, 543 U.S. 146, 152 (2004). "Probable cause is more than mere suspicion. Probable cause exists when, 'under the totality of circumstances known to the arresting officers, a prudent person would have concluded that there

was a fair probability' that a crime was committed." *Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994) (quoting *United States v. Smith,* 790 F.2d 789, 792 (9th Cir. 1986)). "Because probable cause is an objective standard, an arrest is lawful if the officer had probable cause to arrest for any offense, not just the offense cited at the time of arrest or booking." *District of Columbia v. Wesby*, 583 U.S. 48, 55 n.2 (2018) (citing *Devenpeck*, 543 U.S. at 153–55 & n.2). The parties agree that Plaintiff's state law false arrest claim generally rises or falls with this Fourth Amendment claim. *See* ECF No. 122 at 20 n.8 (asserting that the same standard applies); ECF No. 132 at 8–19 (addressing these claims together).

Probable cause often must be individualized, but that is not an "irreducible requirement"; the ultimate question is whether the officer's belief that the suspect committed a crime "was reasonable in light of the circumstances." *Lyall v. City of Los Angeles*, 807 F.3d 1178, 1194 (9th Cir. 2015).[18] "If a group or crowd of people is behaving as a unit and it is not possible . . . for the police to tell who is . . . engaging in criminal acts and who is not, the police can have [probable cause[19]] as to the members of the group." *Id.* "Police witnesses must only be able to form a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." *Carr v. District of Columbia*, 587 F.3d 401, 408 (D.C. Cir. 2009) (reversing summary judgment granted in favor of plaintiffs who brought Fourth Amendment claims after they were arrested for participating in a riot). On the other hand, "if a person is simply present in the vicinity of potential criminal activity, without doing anything else to indicate that he is engaging in criminal activity or that he is armed and dangerous, the police do not have probable

---

[18] *Lyall*'s separate holding regarding California's Bane Act—that a claim under that statute required "threats, intimidation, or coercion independent from the acts inherent in" a violation of rights, 807 F.3d at 1996—is no longer good law, at least for cases that involve a more than negligent violation of a plaintiff's rights. *Reese v. County of Sacramento*, 888 F.3d 1030, 1044 n.5 (9th Cir. 2018). That holding is not relevant to Plaintiff's Fourth Amendment and false arrest claims, and Defendants rightly do not rely on it in their arguments with respect to Plaintiff's Bane Act claim.

[19] Although *Lyall* primarily concerned reasonable suspicion for the purpose of a *Terry* stop rather than probable cause for arrest, that opinion cites with approval *Carr v. District of Columbia*, 587 F.3d 401 (D.C. Cir. 2009), which applied a substantially similar standard to arrest a group of people based on probable cause without an individualized determination. This Court therefore understands *Lyall* as expressing the Ninth Circuit's view of individualized versus group suspicion in both the reasonable suspicion context and the probable cause context.

cause to search him or reasonable suspicion sufficient to detain him and frisk him for weapons," much less to arrest him. *Lyall*, 807 F.3d at 1194.

In *Lyall*, police responded to a report that "six male Hispanic juveniles wearing 'rocker type' clothing" stole beer from a convenience store, with the report identifying the license plate number of the suspects' truck. *Id.* at 1182 (internal quotation marks omitted). Officers found the truck parked around the corner from a warehouse with a party in progress, and "observed people wearing what they deemed to be 'rocker type' clothing going inside." *Id.* They found a person at the door who met the general description of the suspects, who backed away from them when they asked to speak to the person in charge of the event, and ran inside when they ordered him to stop. *Id.* The officers followed him inside and subdued him, while the crowd yelled at the officers and approached them in a manner they characterized as aggressive. *Id.* A thin wooden partition fell on the officers' heads, startling but not injuring them. *Id.* After those officers called for backup, additional officers ordered all of the partygoers out of the warehouse, lined them up against a fence, patted them down for weapons, and allowed a witness from the convenience store to try to identify suspects for the theft. *Id.* at 1183.

The trial court declined to instruct the jury that individualized suspicion was required, instead instructing that "plaintiffs must prove by a preponderance of the evidence that the officer or officers lacked reasonable suspicion to detain him or her or that the length and scope of the detention was excessive," and that the "touchstone of the Fourth Amendment is reasonableness," with "no irreducible requirement of individualized suspicion." *Id.* at 1194. The jury found for the defense, and the Ninth Circuit found no error in the jury instruction, holding that although some circumstances (like the fact that many plaintiffs did not meet the description of the theft suspects) "bore on the question whether the searches and seizures were reasonable," such questions of individualized suspicion did not render the detentions and searches unconstitutional per se, but instead were factors for the jury to consider. *Id.*

As noted in *Lyall*, the D.C. Circuit's decision in *Carr* (on which *Lyall* relied) rested in part on the premise that requiring "probable cause to believe that each individual person arrested was engaged in the crime of rioting . . . would impose 'an impossible burden' on police." *Id.* (quoting

*Carr*, 587 F.3d at 408). Read as a whole, however, neither of those decisions indicates that police may arrest a whole crowd any time they cannot identify individual suspected lawbreakers within it. Instead, as discussed above, "[p]olice witnesses must . . . be able to form a reasonable belief that the entire crowd is acting as a unit and therefore *all* members of the crowd violated the law." *Id.* (quoting *Carr*, 587 F.3d at 408) (first alteration in original) (emphasis added). *Carr* distinguished, but discussed with approval, the D.C. Circuit's earlier decision in *Barham v. Ramsey*, which held police violated the Fourth Amendment when they arrested of 386 people in a park based solely on the belief that *some* of those people had participated in earlier illegal activity elsewhere, despite "the record show[ing] that many people who could not be tied to illegal activity streamed in and out of the park *before* the mass arrest." *Carr*, 587 F.3d at 407, 408 (discussing *Barham*, 434 F.3d 565 (D.C. Cir. 2006)). There are many circumstances where it may be impossible for police officers to determine who in a crowd of people likely committed a crime. If so, "a dispersal order might be the only means of distinguishing the wholly innocent from the others." *Id.* at 410. The Fourth Amendment does not permit officers to arrest the whole crowd absent a further justification—"a reasonable belief that the entire crowd is acting as a unit" and collectively "violated the law." *Lyall*, 807 F.3d at 1194.

Defendants quote a decision from the District of Arizona as holding that "police officers can arrest a group or crowd of people based on reasonable *suspicion* that a crime has been or is being committed, even when that suspicion is not particularized to each individual." ECF No. 122 at 21 (quoting *Saccoccio v. City of Phoenix*, No. CV-20-01141-PHX-DJH (CDB), 2024 WL 5317421, at *11 (D. Ariz. Dec. 16, 2024) (in turn citing *Lyall*, 807 F.3d at 1194)) (emphasis added). That case did not involve a wrongful arrest claim and addressed the *Lyall* standard only in passing, in considering an officer's justification for a use of force. In the context of the Fourth Amendment, "reasonable suspicion" is a term of art for a lower threshold than probable cause, which—consistent with Supreme Court precedent—the Ninth Circuit applied to the safety-related and investigatory stop at issue in *Lyall*. 807 F.3d at 1193 & n.13 (citing *Terry v. Ohio*, 392 U.S. 1, 27 (1968)). To the extent *Saccoccio* could be read as suggesting that mere "reasonable suspicion" is sufficient to conduct a mass *arrest*, that dicta is not an accurate statement of law. Nor is there

any dispute that Plaintiff's detention in this case was an "arrest" for the purpose of the Fourth Amendment. As Defendants acknowledge, "Plaintiff must show that the arrest occurred without probable cause." ECF No. 122 at 20 (citing *District of Columbia v. Wesby*, 583 U.S. 48, 60 (2018)).

This Order addresses in turn three purported categories of criminal conduct that Defendants contend established probable cause to arrest Plaintiff: the crowd as a whole participating in an unlawful assembly, either at Dolores and 18th Street or earlier on Church Street; the crowd as a whole failing to heed earlier orders to disperse; and Plaintiff himself violating various traffic laws. In doing so, the Court also considers the doctrine of qualified immunity, which shields "government officials performing discretionary functions. . . from liability for civil damages [under § 1983] insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Harlow v. Fitzgerald*, 457 U.S. 800, 818 (1982). Where not otherwise specified, the Court's analysis addresses Plaintiff's claims against Captain Harvey as the officer who ordered the arrest, as well as his state law false arrest claim against the City to the extent it is vicariously liable for Harvey's conduct under section 815.2 of the California Government Code.[20] The Court addresses Plaintiff's claim against Sullivan separately below, followed by Plaintiff's claims based on a theory of supervisory liability.

**1. Unlawful Assembly at Dolores Street and 18th Street**

The Penal Code defines an "unlawful assembly" as "two or more persons assemble together to do an unlawful act, or do a lawful act in a violent, boisterous, or tumultuous manner". Cal. Penal Code § 407. To accord with the First Amendment, the California Supreme Court has limited the "lawful act" portion of that definition to "assemblies which are violent or which pose a clear and present danger of imminent violence." *In re Brown*, 9 Cal. 3d 612, 623 (1973).[21]

[20] Plaintiff has not pursued a § 1983 claim against the City under the doctrine of *Monell v. Department of Social Services*, 436 U.S. 658 (1978). *See* ECF No. 94 at 20.
[21] The parties do not address this standard, but the Court addressed it previously in the related *J.T.* case. *J.T. v. City & County of San Francisco*, No. 23-cv-06524-LJC, 2024 WL 3012791, at *18 (N.D. Cal. June 13, 2024).

Participating in an unlawful assembly is a misdemeanor. Cal. Penal Code § 408. "If a person is a participant in a lawful assembly which becomes unlawful, he has an immediate duty upon learning of the unlawful conduct to disassociate himself from the group." *In re Wagner*, 119 Cal. App. 3d 90, 103 (1981).

Plaintiff argues in his motion that Defendants could not properly conduct a mass arrest without giving an order to disperse, ECF No. 118 at 11–16, based on the D.C. Circuit's holding that "officers may quell an unruly demonstration by 'deal[ing] with the crowd as a unit' only after invoking a valid legal mechanism for clearing the area and then providing an opportunity for affected persons to follow an order to disperse." *Barham*, 434 F.3d at 576 (alteration in original; citation omitted). A strict reading of that holding might suggest that Defendants could not conduct a mass arrest for unlawful assembly based on conduct at the intersection of 18th and Dolores—regardless of whether such conduct established an unlawful assembly—without first giving an order to disperse at that location, thus potentially warranting summary judgment for Plaintiff on this issue without need to consider whether an unlawful assembly occurred.

However, the D.C. Circuit limited that rule in its subsequent *Carr* decision, holding that a dispersal order is not required where there is probable cause to believe "that the crowd is acting unlawfully as a unit." 587 F.3d at 410; *see also Lyall*, 807 F.3d at 1194 (citing *Carr* with approval). The Ninth Circuit later expressly declined to resolved whether "the Constitution might require advance notice before undertaking steps such as, for example, individual arrests for failing to disperse." *Puente v. City of Phoenix*, 123 F.4th 1035, 1064 n.7 (9th Cir. 2024). To the extent that remains an open question of law in this circuit, Defendants would be entitled to qualified immunity on the question of whether a dispersal order was required before arrest for unlawful assembly that was otherwise supported by probable cause as to a cohesive group, because there is neither "controlling authority [n]or a robust consensus of . . . persuasive authority" holding that such an order is always required. *See Wesby*, 583 U.S. at 63.

The lack of an order to disperse at 18th and Dolores therefore does not warrant summary judgment in Plaintiff's favor on the unlawful assembly theory of probable cause. The Court proceeds to consider whether Captain Harvey had reason to believe that a cohesive group at 18th

Street and Dolores constituted an unlawful assembly due to unruly conduct, fireworks, or other behavior that was violent or clearly gave rise to an imminent threat of violence.

**a. Unruly Conduct When Plaintiff Arrived**

At the time that Plaintiff arrived at 18th and Dolores Street, at approximately 8:27 pm, which is also when Captain Harvey ordered the arrest, the record does not reflect that the crowd near that corner was violent or exhibiting a clear risk violence. At the very least, for the purpose of evaluating Defendants' motion, a reasonable jury could conclude that teenagers yelling at police officers while they took photos of themselves in front of the officers did not "pose a clear and present danger of imminent violence," and that the lack of such threat should have been clear to a reasonable officer present. *See In re Brown*, 9 Cal. 3d at 623. At the hearing, defense counsel conceded that the interaction at that corner "would be low on [her] list of violent acts that day." ECF No. 139 at 16:2–7.

Even presuming for the sake of argument that the taunts and threats established an unlawful assembly, Defendants draw only a weak link between Plaintiff and the boys actively antagonizing police officers. Defendants do not dispute that filming police officers is protected activity. *See Bernal v. Sacramento Cnty. Sheriff's Dep't*, 73 F.4th 678, 699 (9th Cir. 2023) ("Recording and verbally challenging police are not only legal actions but are protected by the First Amendment."). Nevertheless, Defendants argue that Plaintiff's "*filming* [the other boys'] threats, harassment and physical menacing of the police is strong evidence that he was aware that the group was engaged in this sort of conduct and he did not immediately disassociate himself from it." ECF No. 134 at 10 (emphasis in original); *see also* Rhodes Decl. ¶ 20 (asserting that Plaintiff and others stood "behind them laughing, taking videos, and otherwise encouraging them"). Defendants seem to be saying, in effect, that though they cannot arrest someone *for* filming police responding to unlawful conduct, they can arrest that person *because* such filming demonstrates knowledge of the unlawful conduct and failure to disassociate from it, even in the absence of any other participation by the arrestee in the conduct at issue.

Under Defendants' theory, it is difficult to conceive of a circumstance in which a person filming an unlawful assembly would not be deemed part of it by virtue of failing to disassociate

United States District Court
Northern District of California

from it. This would render the First Amendment's protection meaningless in many of the circumstances where it is most important. *See Fordyce v. City of Seattle*, 55 F.3d 436, 439 (9th Cir. 1995) (recognizing the plaintiff's "First Amendment right to film matters of public interest"). Though it is conceivable that a person could engage in additional activity, while filming an unlawful assembly, that contributes to violence or adds to a clear and present danger of imminent violence, Defendants do not point to any such behavior by Plaintiff. In this respect, Defendants' theory runs counter to Captain Harvey's own deposition testimony, where he stated that someone who arrived at the corner of Dolores Street and 18th Street during the events in question and took videos would be a witness rather than a participant, and that such a person would not have committed an arrestable offense. ECF No. 119-2 at 19–20 (Harvey Dep. at 276:8–277:21).

Furthermore, to the extent Defendants suggest Plaintiff was subject to arrest because he laughed and provided commentary, rather than condemning the other boys' conduct or remaining silent, that would seem to target Plaintiffs' protected speech. Additional factors to establish probable cause, beyond the "mere propinquity" rejected in *Ybarra*, "cannot consist of inferences of possible criminal involvement based solely on an individual's First Amendment-protected activities and associations." *Santopietro v. Howell*, 73 F.4th 1016, 1025 (9th Cir. 2023) (citing *NAACP v. Claiborne Hardware Co.*, 458 U.S. 886 (1982); *Healy v. James*, 408 U.S. 169 (1972)).

**b. Aftermath of a Thrown Firework**

The non-violent (albeit abrasive) state of the crowd at 18th Street and Dolores potentially changed around 8:30 p.m., when police officers reported someone throwing a "barrel bomb" firework and Plaintiff testified that he heard something like a gunshot. In their reply, Defendants assert that the crowd was "attacking police officers," citing Rhodes's declaration regarding a thrown firework. ECF No. 134 at 7–8 (citing ECF No. 122-38, ¶ 23).[22] When that happened, however, the crowd largely attempted to get away from it, with most people moving east, in the opposite direction from the incident. They were unable to do so because Harvey had already given the order to arrest the crowd and police officers led by Lieutenant Sullivan were

---

[22] Defendants do not contend that Plaintiff had any role in throwing the firework, or that officers believed or had any reason to believe that he did.

approaching westward on 18th Street from Guerrero Street on the east. *See* ECF No. 122-25, ¶¶ 27, 30. The thrown firework therefore cannot provide probable cause to arrest the crowd for unlawful assembly for two separate reasons. First, the arrest had already been ordered and was already being carried out. And second, the crowd of bystanders to the firework did exactly what the unlawful assembly law required, by trying to leave the area. *See Wagner*, 119 Cal. App. 3d at 103. To the extent a handful of people like Plaintiff and his friend L. did not immediately move east with the larger crowd, they effectively disassociated themselves from the crowd (at least for the purpose of this discrete incident) by remaining alone or in much smaller groups.

**c. Traffic Obstruction**

Defendants also argue that the assembly was unlawful because participants were "blocking traffic." ECF No. 134 at 7–8. Video recordings show that while some people were in the street, most were on the sidewalk, and pedestrians were able to pass by on the sidewalk notwithstanding the crowd. Defendants quote a California appellate court's decision in *People v. Carpenter* for the premise that a participant's continued participation despite knowledge "that *someone* in the assembly" committed an unlawful act "is what defines the offense" of unlawful assembly. *Carpenter*, No. A135814, 2014 WL 5667023, at *12 (Cal. Ct. App. Nov. 5, 2014); *see* ECF No. 122 at 22. But *Carpenter*—a non-precedential case designated as unpublished and uncitable by the Court of Appeal—did not involve an unlawful assembly charge under sections 407 and 408, and instead only addressed those statutes in passing to distinguish them from the charge at issue of resisting a peace officer and causing serious injury in violation of section 148.10 of the Penal Code.

The earlier precedential decision *In re Wagner*, on which *Carpenter* relied for its discussion of the unlawful assembly statutes, held that "[n]ot every member of the assembly must individually commit unlawful acts to render the assembly unlawful," but the unlawful conduct must in some sense be attributable to the group at large. *Wagner*, 119 Cal. App. 3d 90, 103–04 (1981); *see also id.* at 108 (noting that the charge turns on "facts concerning the conduct of the total assembly"). The petitioners in that case, challenging their convictions through habeas corpus, argued that a construction of the statute that looked beyond a defendant's individual

conduct would require all attendees at a sporting event "to leave or risk being arrested for unlawful assembly" if a fight broke out in the crowd. *Id.* at 103–04. The court held that "[s]uch a strained construction [of the statutes] ignores reality," because "[a]lmost never could an entire audience be deemed to be encompassed in an assembly doing an unlawful act." *Id.* at 104. "The extent of the group and the membership therein are merely questions of fact." *Id.* That standard resembles to some degree *Lyall* and *Carr*'s test for non-individualized suspicion to conduct a mass arrest or temporary detention.

If Defendants here intend to pursue a theory that some people standing and skateboarding in the roadway of 18th Street provided probable cause to arrest even those who stood on the sidewalk of the same block as part of an unlawful assembly, a jury will need to address "questions of fact" regarding the "extent of the group and the membership therein," including whether the officers' assessment of such issues was reasonable. *See id.* Depending on how a jury views the video evidence and officers' testimony of what they observed, and what inferences the jury draws from such evidence, the jury might—or might not—determine that it was unreasonable for officers to have considered the "entire [crowd] encompassed in an assembly doing an unlawful act." *See id.* The evidence for such a theory is not as strong here as in *Haber v. City of Portland*, a mass arrest case where the District of Oregon granted summary judgment for police defendants based on multiple sources of evidence showing that "people . . . observed on the sidewalk . . . appeared to be a part of [a] march" obstructing traffic, and that "officers understood, based on past experience, that protestors fluidly moved between the street and the sidewalk." *Haber*, No. 3:17-cv-01827-JR, 2020 WL 7129596, at *16 (D. Or. Dec. 4, 2020) (cleaned up), *recommendation adopted*, 2021 WL 1341853 (D. Or. Apr. 9, 2021); *see also Carr*, 587 F.3d at 407 (noting that the arrestees marched as a group, some in the group through objects at windows, and "[e]ach time a window was broken . . . the group cheered and its members raised their arms" (quoting a police officer's affidavit)).

The unlawful assembly statutes therefore do not warrant granting summary judgment for either party on the issue of probable cause to the extent such cause might be based on conduct occurring at Dolores Street and 18th Street, when Plaintiff was present.

**2. Unlawful Assembly Based on Earlier Unrest**

A question could remain as to whether police had probable cause to believe the people gathered at Dolores Street and 18th Street were part of an unlawful assembly *earlier* in the evening during active vandalism and resistance to police, and whether they were therefore subject to arrest for not dispersing from the group after that earlier conduct occurred. Harvey issued multiple orders to disperse during that earlier unrest, and—at least under Defendants' theory that the same group moved together to 18th Street—the crowd failed to comply. Accordingly, if police had sufficient cause to believe it was the same group, then failure to disperse (as discussed below) would provide a more straightforward framework to evaluate probable cause for the arrest. The Court need not separately resolve the overlapping question of whether an earlier unlawful assembly elsewhere could have provided probable cause to arrest the group of people gathered at this intersection.

**3. Failure to Disperse**

Under section 409 of the California Penal Code, a "person remaining present at the place of any riot, rout, or unlawful assembly, *after the same has been lawfully warned to disperse* . . . is guilty of a misdemeanor." Cal. Penal Code § 409. "The plain objective of section 409 is to enable law enforcement officers to de-fuse riotous situations by ordering persons to remove themselves from the area without any need to distinguish between the rioters and bystanders whose very presence aggravates the problem of restoring tranquillity [sic]." *People v. Cipriani*, 18 Cal. App. 3d 299, 309 (1971).[23]

Plaintiff does not dispute that Defendants issued numerous orders to disperse earlier in the evening at other locations, that they were justified in doing so, and that they lawfully could have arrested the people in the vicinity of those orders who failed to disperse at that time. *See* ECF No. 132 at 15. Defendants do not dispute that Plaintiff was around two miles away at the time of the final amplified order to disperse, where he would not have heard it. Nor is there evidence of any

[23] This reasoning behind section 409 further emphasizes the need for officers to "distinguish between the [lawbreakers] and bystanders," *see* 18 Cal. App. 3d at 309, in the *absence* of an order to disperse, at least where officers do not have probable cause to believe that the group as a whole broke the law.

order to disperse, amplified or otherwise, after Plaintiff arrived. There is also ample evidence of pedestrians continuing to walk the sidewalks surrounding Dolores Park, including at 18th and Dolores, though SFPD had barricaded the steep portion of Dolores Street and at about 8:00 p.m. cleared the intersection at 18th and Church before moving with motorcycles north towards 17th Street. The question, then, is whether officers had reasonable grounds to believe there was a "fair probability," *see Gasho*, 39 F.3d at 1428, that the group Harvey ordered arrested at 18th Street and Dolores Street—or perhaps more accurately, the group ultimately arrested at 17th Street around 8:40 p.m. based on that order—had, "as a unit," been present for earlier dispersal orders elsewhere and failed to disperse. *See Lyall*, 807 F.3d at 1194.

The Supreme Court held nearly fifty years ago that "a person's mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause to search that person." *Ybarra v. Illinois*, 444 U.S. 85, 91 (1979). An earlier case on which *Ybarra* relied, *Sibron v. New York*, 392 U.S. 40, 62 (1968), applied essentially the same principle to probable cause for both a search and an arrest. Defendants therefore could not permissibly arrest bystanders on 18th Street (or 17th Street, where the mass arrest was completed) based on their mere proximity to others who had engaged in vandalism or failed to comply with earlier orders to disperse on Church Street. The relevant question is whether Defendants reasonably believed that all of the arrestees were part of the group that disregarded orders to disperse earlier in the evening on Church Street, rather than bystanders who came to 18th Street (or perhaps later to 17th Street) from elsewhere. *See Dinler v. City of New York*, No. 04 Civ. 7921 (RJS) (JCF), 2012 WL 4513352, at *15 (S.D.N.Y. Sept. 30, 2012) (applying a standard derived from *Carr*). That in turn raises the question of how Defendants differentiated bystanders from participants in the earlier unrest.

The D.C. Circuit held in *Barham* that a mass arrest violated in *Ybarra* when "pedestrian traffic flowed freely into" and out of the park where the arrest occurred "in the hour before the arrests," with no evidence of "how many individuals in the park had previously violated the law," nor any "indication of how an officer might distinguish between a 'demonstrator' and a person walking to work or enjoying a stroll through the park, let alone how one would distinguish

someone engaged in an allegedly illegal assembly from a passerby interested in hearing the political speech of protestors." 434 F.3d at 574. Under those circumstances, "allegedly illegal activities observed *near* the scene of the arrest *before* 'demonstrators' converged on" the park could not provide probable cause to arrest everyone present in the park, because many of the people present had done nothing more than find themselves in the vicinity of others who were suspected of criminal conduct. *Id.* In *Carr*, the D.C. Circuit distinguished the fluidity and random association of the crowd arrested in *Barham* from a group of demonstrators who marched together and collectively celebrated when some in that group threw objects and broke storefront windows. *Carr*, 587 F.3d at 407–08. That court held that plaintiffs were not entitled to summary judgment on a false arrest claim where "police accounts uniformly state[d] that police arrested those members of the crowd who ran into the alley, as opposed to indiscriminately arresting everyone they happened to find in the alley as in *Barham*." *Id.* at 409.

Accordingly, events occurring at one time and location generally do not provide probable cause to conduct a mass arrest at a different time and location, at least absent some showing that both involved the same group of people. *See Haber*, 2020 WL 7129596, at *9 ("[A]ny purported reasonable suspicion related to the events that transpired in Chapman or Lownsdale does not support plaintiffs' detention, which was temporally and geographically distinct."). But courts have allowed such arrests under some circumstances, where there is sufficient cause to believe both that an earlier group collectively violated the law, and that the subsequent arrest captured only members of that earlier group. *See Carr*, 587 F.3d at 407–09.

Defendants cite *Amaral v. City of San Diego*, where the district court granted summary judgment for the defense on the basis that an officer had probable cause to arrest the plaintiff under section 409 around twenty minutes after police had given orders to disperse in a different location. No. 3:17-cv-2409-L-LL, 2021 WL 1226419, at *4 (S.D. Cal. Mar. 31, 2021). The plaintiff there had in fact been part of the protest where police ordered protestors to disperse after fires were set, but the arresting officer testified at a deposition that he did not know whether the plaintiff had heard dispersal orders, and there is no indication that the officer knew whether the plaintiff had been at the protest. *Id.* at *1, *3. The district court held that the officer had probable

cause to arrest under section 409 because the plaintiff "was in a parking lot—where other police officers were making arrests—approaching the officers," and the arresting officer "had also received a radio transmission that there was a disturbance in that area and individuals intended to move onto the highway," which had a nearby entrance. *Id.* at *3–4. The court did not otherwise explain how those factors supported a conclusion that the plaintiff had heard orders to disperse and failed to do so.

The Ninth Circuit affirmed in an unpublished memorandum disposition, as follows:

> The district court properly concluded that Williams had probable cause to arrest Amaral for failure to comply with a dispersal order in violation of California Penal Code § 409. *See* Cal. Penal Code § 409 ("Every person remaining present at the place of any riot, rout, or unlawful assembly, after the same has been lawfully warned to disperse ... is guilty of a misdemeanor."). Around 8:20 p.m., an unlawful assembly announcement and order to disperse was issued. Around 8:38 p.m., Williams saw Amaral in the vicinity of a "disturbance" where other police officers were making arrests. From these facts, a "prudent person would believe [that Amaral] had committed a crime." *Dubner*, 266 F.3d at 966. The district court did not err in granting summary judgment in favor of Defendants on Amaral's unlawful arrest claim, as no reasonable jury could conclude that Williams lacked probable cause to arrest Amaral for violating California Penal Code § 409. *See Gasho v. United States*, 39 F.3d 1420, 1428 (9th Cir. 1994).

*Amaral v. City of San Diego*, No. 21-55420, 2022 WL 1686681, at *2 (9th Cir. May 26, 2022).

Plaintiff failed to address *Amaral* in his opposition brief. At the hearing, however, Plaintiff's counsel argued that the case at hand is distinguishable because all parties acknowledge that there were at least some bystanders present who were not part of the earlier unrest, at least some of whom were not subject to arrest. The Court agrees. In *Amaral*, it was undisputed that the plaintiff was not a bystander—he was present at the protest that had been ordered to disperse—and at the time of his arrest he was in a parking lot approaching officers who were arresting other individuals. 2021 WL 1226419, at *1. The arresting officer had received a report of a disturbance in the area where the parking lot was located, and that individuals intended to go onto a highway. *Id.* at *1, *7. Unlike here, there is no indication that officers in that case had any reason to believe that bystanders, unconnected to the earlier protest and order to disperse, were present at the location where the plaintiff was arrested in the context of a subsequent related disturbance.

Here, in contrast to *Amaral*, Defendants acknowledge that bystanders with no connection to illegal activity at least passed through the area in question in the period leading up to the mass arrest. *See, e.g.*, ECF No. 131-3 at 8 (Sullivan Dep. at 26:2–17); ECF No. 122-45 (Solomon Decl.) ¶¶ 44–46; ECF No. 122-27 (Daggs Decl.) ¶ 22. That fact also distinguishes this case from *Carr*, where the "parties agree[d] that there [was] no affirmative evidence . . . of individuals not associated with the protest being present in the alley" where the arrest occurred. *Carr*, 587 F.3d at 408. Viewing the record in the light most favorable to Plaintiff, this case is instead closer to *Barham*, where "pedestrian traffic flowed freely into the park in the hour before the arrests," and there was no evidence to show how the defendant officers determined which occupants of the park to arrest based on earlier illegal conduct elsewhere. *See Barham*, 434 F.3d at 574.

To the extent Defendants assert that they believed they arrested only lawbreakers and not bystanders, there are grounds to question whether Defendants' belief was reasonable. At his deposition, Harvey characterized the operation as "hot pursuit if you will" of the Church Street crowd, but that testimony—at least read literally—is not consistent with the video evidence. *See* ECF No. 119-2 at 21 (Harvey Dep. at 278:9–14). But much like in *Barham*, some time passed between when people arrived at 18th Street from the Church Street unrest and when officers executed the encirclement that led to the mass arrest at 17th Street. All parties acknowledge that the area was accessible to people (like Plaintiff) who had not been present for earlier events where the police ordered the crowd to disperse, but instead arrived from other directions. All parties acknowledge that there were some obvious bystanders, whom Defendants did not believe were part of the events at issue and did not arrest. And there is no dispute that at least two people who were not present for the earlier dispersal orders—Plaintiff and his friend L.—were nevertheless arrested, apparently based in part on officers' erroneous belief that they had been present earlier. What is less clear is how Defendants made their decisions of whom to arrest, and whether they did so reasonably.

Video evidence from when the police cleared most people off of 18th Street and followed the crowd north on Dolores Street towards 17th Street shows that some people (two girls or young women) who asked to go elsewhere were told by officers that they needed to follow the group

north, where they were presumably arrested. Rhodes Decl. Ex. 1 at 8:30:58 p.m. The same is true for some people who remained on the northeast corner of the intersection before being ordered to follow the crowd. Daggs Decl. Ex. 1 at 8:33:08 p.m. Other people were allowed to pass through officers' lines or remain in the vicinity of 18th Street and Dolores Street. *See, e.g.*, Solomon Decl. Ex. 11 at 8:31:15 p.m. Officer Solomon states that earlier in the encirclement, when many people on 18th Street ran east away from the thrown firework, he determined that people who were "were walking at their own pace, obeying traffic laws (not walking in the street) and were not staying closely huddled with the group" were "obvious[ly] . . . not part of the group" even when they were moving in the same direction. ECF No. 122-45 (Solomon Decl.) ¶ 44. That statement does not account for how Plaintiff—who did not move east with "the group," but instead stayed with his friend on the corner of Dolores Street at that time—would then reasonably be considered part of the group and subject to arrest. *See* Bates Decl. Ex. 3 at 8:30:37 p.m. Officers' reasons for arresting some but not all of the people present on or near the block of 18th Street between Dolores Street and Guerrero Street are not clear from the record. A jury will need to determine what those reasons were before it would be possible to assess whether they were reasonable.

Taking into account officers' observations of the crowd moving from Church Street to Dolores Street, the similar age and dress of many of the attendees, and the prolific skateboards among the crowd, it *might* have been reasonable for officers to arrest people like Plaintiff who met those descriptions based on a belief that all such people had been part of the earlier unrest. On the other hand, perhaps Defendants should have expected that the crowd would include late arrivals to the Hill Bomb—teenagers are not generally known for their punctuality—like Plaintiff and L., who met the same general description as earlier attendees but had not been present for the last dispersal order twenty to thirty minutes earlier. There may also be questions of whether it would have been reasonable to anticipate the presence of Hill Bomb attendees who had left the immediate perimeter of Dolores Park earlier when police announced the event was canceled (*see* ECF No. 122-23, ¶ 20) and who were not part of the subsequent unrest there or on Church Street, or other teenagers who looked like the skateboarders but had no connection to the event and simply happened to be out in the busy Mission District. Those questions turn on factual issues of

the nature of the event, crowd, and neighborhood, and the officers' reasonable understanding thereof. It will fall to a jury to determine what inferences to draw from the factual record, which includes only limited evidence as to those issues.

Even if Defendants might have been justified in presuming that young people dressed like the earlier crowd or carrying skateboards were likely present earlier (a question that this Order does not resolve), it is not clear that those categories were relevant to their decisions of whom to arrest. Notably, Harvey testified that attendees were not detained based on their age or possession of a skateboard. ECF No. 119-2 at 6–7 (Harvey Dep. at 224:18–225:3).

Harvey's declaration indicates that he presumed that anyone who stayed on 18th Street, as opposed to merely passing through, was engaged in criminal activity. *See* ECF No. 122-23, ¶ 39. Based on the limited and somewhat contradictory evidentiary record regarding how Defendants decided whom to arrest and whom to let go, a jury would need to determine as a question of fact whether Harvey's explanation accurately describes Defendants' conduct: whether officers arrested people who had stopped on 18th Street and declined to arrest people who kept walking. Even if that was how officers distinguished whom to arrest, the reasonableness of Harvey's expectation—that passersby would not stop and watch teenagers congregated and skateboarding on a city street and sidewalk with police officers standing by—is perhaps subject to question. There is no evidence that anyone had set off fireworks or engaged in vandalism at that location before Harvey gave the order to arrest, and police gave no orders for the crowd on 18th Street to disperse. The reasonableness of an officer's decisions can, in some circumstances, be a question of law for the Court. Here, however, the reasonableness of Harvey's presumption may depend on what he knew or should have known about the Hill Bomb event, the Mission District neighborhood, and the typical behavior of crowds, among other potentially relevant factors. Such questions implicate factual issues best resolved at trial.

The limited evidentiary record as to how (if at all) the arresting officers sorted arrestees from bystanders precludes summary judgment for either party on that question. A jury will need to determine what inferences are appropriate to draw from that record before assessing the reasonableness of Defendants' decisions.

The doctrine of qualified immunity does not alter that conclusion. As Defendants note, the Supreme Court has "stressed the need to identify a case where an officer acting under similar circumstances was held to have violated the Fourth Amendment." *District of Columbia v. Wesby*, 583 U.S. 48, 64 (2018) (cleaned up). At the hearing, Defendants asserted that because they are not aware of any precedential decision finding that any mass arrest violated the Fourth Amendment, *see* ECF No. 139 at 35:19–23, virtually any mass arrest would find shelter in qualified immunity, potentially even (for example) an arrest twelve hours after a riot occurred at a different location, though they conceded that a "very obvious case" of wrongful mass arrest might not be protected, *id.* at 42:3–43:5.

Qualified immunity does "not require a case directly on point" to impose liability, "but existing precedent must have placed the statutory or constitutional question beyond debate." *Ashcroft v. al-Kidd*, 563 U.S. 731, 741 (2011). The outcome must be "dictated by [either] 'controlling authority' or 'a robust consensus of cases of persuasive authority.'" *Wesby*, 583 U.S. at 63 (quoting *al-Kidd*, 563 U.S. at 741–42)).

For the purposes of this case, the Supreme Court's longstanding precedent that "mere propinquity to others independently suspected of criminal activity does not, without more, give rise to probable cause" is controlling authority which places that principle beyond debate. *Ybarra*, 444 U.S. at 91; *see Sibron*, 392 U.S. at 62. The appellate decisions in *Carr* and *Lyall* addressing arrests (or *Terry* stops) based on non-individualized suspicion of course cannot alter the Supreme Court's holding that mere association is not sufficient, and they do not purport to. Based on the factual record currently before the Court, a jury might reasonably determine that Defendants lacked a reasonable basis to believe that group they arrested had, "as unit," failed to heed earlier dispersal order (or otherwise "violated the law"). *See Lyall*, 807 F.3d at 1194 (quoting *Carr*, 587 F.3d at 408). If the jury determines that Defendants arrested Plaintiff merely because he was "simply present in the vicinity of potential criminal activity," such an arrest would violate clearly established law, and would not be protected by qualified immunity. *See id.* at 1195 (discussing *Ybarra*, 444 U.S. 85).

Given the conflicting evidence in the record, there is a material dispute of fact concerning

United States District Court
Northern District of California

the circumstances in which Captain Harvey authorized the mass arrest. A jury could determine that the fluid presence of bystanders and pedestrians at the intersection of 18th and Dolores made Captain Harvey's decision to authorize a mass arrest unreasonable under the Fourth Amendment, if the hundred-plus individuals captured in the mass arrest were arrested based merely on their "mere propinquity to others independently suspected of criminal activity" in violation of *Ybarra*. *See also Barham*, 434 F.3d at 574. The question of qualified immunity, like the underlying question of a violation of the Fourth Amendment, thus requires resolution of disputed facts at trial. *See, e.g.*, *Cardenas-Ornelas v. Johnson*, 165 F.4th 1234, 1242 (9th Cir. 2026) (holding "that the district court properly denied qualified immunity" on summary judgment, "without foreclos[ing] the trier of fact from making factual determinations which could result in the post-trial grant of qualified immunity").

**4. Plaintiff's Violation of Vehicle and Transportation Codes**

Defendants' motion for summary judgment asserts that Plaintiff personally violated sections 21461.5, 21453(d), 21950(b), and 21456(b) of the California Vehicle Code by stepping into the street and crossing an intersection against a red light[24] and do-not-walk signal. Defendants also cite section 7.2.13(b)(4) of the San Francisco Transportation Code, *see* ECF No. 122 at 23, which provides that riding a "non-motorized user-propelled vehicle" on a roadway "against the direction of traffic" is an infraction. Defendants contend that Plaintiff violated section 7.2.13(b)(4) by skateboarding against the direction of traffic when he arrived moving westbound on the south side of 18th Street.

Those violations were not shared by the group as a whole. Video evidence indicates that many people present stood on the sidewalk rather than the street, only some crossed against a do-not-walk signal, and many did not have skateboards or other "non-motorized user-propelled vehicles" with which they could have violated section 7.2.13(b)(4) of the Transportation Code. The record thus does not demonstrate probable cause to determine that the crowd on 18th Street,

[24] Defendants' motion refers to a "green light and red hand signal," ECF No. 122 at 23, but the traffic light is red in the video evidence. *See, e.g.*, Solomon Decl. Ex. 11 at 8:29:30 p.m. The distinction is not material to the outcome of the present Motions.

acting as a unit, violated any of those laws, as would be necessary to support a mass arrest under *Lyall* based on that conduct. Plaintiff's counsel conceded at the hearing, however, that *if* there was individualized probable cause to arrest Plaintiff specifically (which he disputes), that would be sufficient to defeat his claim even if the arrest was overbroad because Defendants lacked probable cause to arrest others in the group. ECF No. 139 at 26:12–19. The Court therefore considers whether Defendants had probable cause to arrest Plaintiff, specifically, for violations of the California Vehicle Code and the San Francisco Transportation Code.

**a. Prohibitions of Arrest**

Neither party addresses that the California Vehicle Code sections on which Defendants rely—sections 21461.5, 21453, 21950, and 21456—each include substantially identical subsections that prohibit peace officers from arresting pedestrians for violations "unless a reasonably careful person would realize there is an immediate danger of a collision with a moving vehicle or other device moving exclusively by human power." Cal. Vehic. Code §§ 21461.5(b)(1), 21453(e)(1), 21950(e)(1), 21456(b)(1). The San Francisco Transportation Code provision at issue has no equivalent limitation.

Plaintiffs cite "SFPD Gen. Order 9.07.04(A)(9) rev. 1/11/23" as prohibiting pedestrian stops for Vehicle Code and Transportation Code violations unless there is immediate danger of a collision with a vehicle. ECF No. 132 at 13. Defendants argue that general order was not yet in effect during the events at issue, citing a July 2024 version of it. ECF No. 134 at 14. Plaintiff appears to have the better argument on that issue, as the January 2023 revision he cites is available on the City's website and includes the provision on which he relies. *See* S.F. Police Dept. General Order 9.07, Curtailing the Use Of Pretext Stops, Rev 1/11/23, *available at* https://www.sf.gov/sites/default/files/2023-01/PoliceCommission11123-DGO%209.07_12.28.22_CLEAN.pdf [https://perma.cc/D32R-5H7M]. If this local policy limiting enforcement were relevant, it might be appropriate to conduct further discovery as to whether that document reflects an actual policy in effect at that time.

Defendants, however, are correct that state and local laws restricting arrests do not render an arrest unreasonable for the purpose of the Fourth Amendment. *Edgerly v. City & County of*



United States District Court
Northern District of California

*San Francisco*, 599 F.3d 946, 956 (9th Cir. 2010) (citing *Virginia v. Moore*, 553 U.S. 164, 128 S. Ct. 1598, 1607 (2008)).[25] That principle applies at least to General Order 9.07, a local policy directing officers not to arrest people for certain violations that might otherwise support an arrest. The Court therefore disregards the General Order as legally irrelevant to whether Plaintiff's arrest was constitutionally permissible.

It is perhaps less clear if *Edgerly* and *Moore* apply to the purported Vehicle Code violations at issue, where the very statutory sections that establish the violations on which Defendants rely also limit Defendants' authority to make arrests. This Court is not aware of authority holding that the Fourth Amendment allows officers to arrest someone for violating a statute that *itself* specifically prohibits the arrest in question. Such a result would be, at best, unintuitive.

The Court need not resolve that question, however, because there is no indication that Harvey, as the officer directing the arrest, saw or was otherwise aware of Plaintiff's purported Vehicle Code and Transportation Code violations at the time he ordered the mass arrest. The same is true of Sullivan, whom Plaintiff sues as an integral participant in the arrest. Defendants have not offered evidence that any other officer who was responsible for Plaintiff's arrest knew that Plaintiff—specifically and individually—had committed traffic violations.

**b. Collective Knowledge Doctrine**

To overcome Harvey's lack of personal knowledge, Defendants rely on the collective knowledge doctrine, which permits courts to impute knowledge among officers working together under some circumstances. ECF No. 122 at 21. The Ninth Circuit—in the primary case cited by Defendants—has explained that the collective knowledge doctrine can apply in two circumstances.

First, and somewhat controversially, the Ninth Circuit "ha[s] been willing to aggregate the facts known to each of the officers involved at least when there has been communication among agents" involved in an investigation, even if specific relevant information was not actually

[25] The parties do not address the state law at issue in *Edgerly*, which generally prohibits taking people into custody for infractions, and might also apply here if it were not for *Edgerly*'s holding that it is not relevant to analysis under the Fourth Amendment. *See* Cal. Penal Code § 853.5(a).

communicated and "no single law enforcement officer knows all of the facts necessary to establish . . . probable cause." *United States v. Ramirez*, 473 F.3d 1026, 1032 (9th Cir. 2007) (cleaned up). This Order refers to that version as the "investigative team" theory of collective knowledge.

Second, and with perhaps stronger "roots in numerous decisions of the Supreme Court and lower courts," the Ninth Circuit has endorsed a collective knowledge theory "where an officer (or team of officers), with direct personal knowledge of *all* the facts necessary to give rise to reasonable suspicion or probable cause, *directs or requests* that another officer, not previously involved in the investigation, conduct a stop, search, or arrest." *Id.* at 1033 (second emphasis added). As Plaintiff notes in his reply, ECF No. 136 at 6–7, that version does not apply here: there is no evidence that Harvey, as the officer directing the arrest, personally knew potentially relevant information about Plaintiff's individual conduct.

The "investigative team" theory perhaps comes closer, but it too does not fit these facts. That version of the collective knowledge doctrine has "a limited requirement that there be a communication but not necessarily the conveyance of any actual [specific] information *among* officers," such that it applies to "officers working in close concert with each other" and "functioning as a team." *Id.* at 1032–33, 1036 (emphasis added; citations omitted). Reasonable minds might differ on the wisdom of that doctrine, but it has some appeal. Recounting and parsing the exact words shared among an investigative team would be all but impossible in many cases, and officers might reasonably rely on their trusted teammates' mere assent to an arrest as tacitly conveying that those teammates' investigations, observations, and knowledge support the decision.

Here, however, there is no evidence that any officer who witnessed Plaintiff at the intersection (whether or not they took note of Plaintiff at the time) communicated with Harvey in any way, as opposed to merely receiving instructions from him. *See, e.g.*, ECF No. 122-23 (Harvey Decl.) ¶ 52 ("To my knowledge, my only communications with Officer Solomon were when I spoke to all officers present at line-up and when he received orders over radio."). Defendants cite no case applying this doctrine to impute the knowledge of scores of officers in a large crowd control operation to their commander, even when those officers did not speak to him

United States District Court
Northern District of California

at all. To do so would stretch the underlying concept of officers "functioning as a team," *see Ramirez*, 473 F.3d at 1036, beyond its breaking point, and would render the decisionmaker's imputed knowledge a pure legal fiction.

The Court asked defense counsel at the hearing to identify a case that "applied this Collective Knowledge Doctrine to officers who didn't communicate with their superior who made the arresting order." ECF No. 136 at 30:19–22. Defendants identified "*Haber* . . . -- an Oregon case that was in the Ninth Circuit." *Id.* at 31:2–7.[26] In that case, however, "the sole decision-maker on the day in question, gave the order to detain marchers for disorderly conduct . . . *based on real time reports from multiple officers directly observing conditions on the ground*, as well as" other sources of information. *Haber*, 2020 WL 7129596, at *15 (emphasis added). That court addressed the collective knowledge doctrine only in a footnote and did not suggest that the decision-making officer could rely on knowledge of officers who never spoke to him at all. *See id.* at *15 n.16. *Haber* thus does not support Plaintiffs' position here.

In the context of crowd control with a heavy police presence, particularly in this era of body worn cameras, such an expansive view of collective knowledge might invite abuses. An officer who arrests someone for an improper reason, or for no reason at all, might expect a reasonable chance that other officers' cameras captured the arrestee having previously stepped into a street, or some other similarly ubiquitous but rarely enforced violation of the law. Expanding the collective knowledge doctrine to impute a sort of hive-mind consciousness to all officers involved in crowd control "would endorse a[n arrest]-first-and-find-ample-justification-later approach that is incompatible with . . . well-established precedent." *See United States v. Anderson*, 101 F.4th 586, 605 (9th Cir. 2024) (Mendoza, J., concurring) (disapproving of post-hoc justification of a warrantless search); *see also, e.g.*, *United States v. Gross*, 662 F.3d 393, 405 (6th Cir. 2011) (declining to allow the after-the-fact discovery of an outstanding arrest warrant to justify an otherwise illegal traffic stop, so as not "to create a system of post-hoc rationalization through which the Fourth Amendment's prohibition against illegal searches and seizures can be

[26] As far as this Court is aware, the district court's decision in *Haber* was not appealed to the Ninth Circuit.

nullified”).

The Court therefore holds the “investigative team” collective knowledge doctrine inapplicable under the facts of this case, where there is no evidence that officers who may have observed Plaintiff violating traffic laws communicated with the officer directing the arrest in any way.[27]

To the extent video evidence demonstrates that Plaintiff committed traffic infractions, there is no evidence that those individual violations were known to Harvey, to any officer who spoke to Harvey, or to any other officer responsible for a decision to arrest Plaintiff. Defendants therefore cannot rely on those violations to establish probable cause for the arrest, and Plaintiff’s motion for summary judgment is GRANTED as to that theory of probable cause.

As discussed above, however, a jury might (or might not) find for Defendants on other theories of probable cause, like that Defendants may have reasonably believed the group they arrested was the same group that had previously failed to comply with orders to disperse. The Court therefore declines to grant summary judgment for either party on Plaintiff’s unreasonable seizure and false arrest claims more generally.

### 5. Claim Against Sullivan

Defendants argue that Plaintiff cannot proceed on a Fourth Amendment unreasonable seizure claim against Sullivan because he was not an “integral participant” in Plaintiff’s arrest. ECF No. 122 at 27–29.[28]

> An actor may be deemed to have “cause[d] [a plaintiff] to be subjected” to a constitutional violation, 42 U.S.C. § 1983, and thus to be an integral participant in the violation, only if (1) the defendant knew about and acquiesced in the constitutionally defective conduct as part of a common plan with those whose conduct constituted the violation, or (2) the defendant set in motion a series of acts by others which the defendant knew or reasonably should have known would cause others to inflict the constitutional injury.

[27] To the extent reasonable minds might differ on this point of law, that is not a basis for qualified immunity. If Harvey did not know at the time that other officers observed Plaintiff violating traffic laws, Harvey could not have reasonably believed that such observations rendered the decision to arrest Plaintiff lawful.

[28] Defendants raise the same arguments as to Chief Scott and Officer Wong, whose dismissal Plaintiff does not oppose.

*Peck v. Montoya*, 51 F.4th 877, 891 (9th Cir. 2022). "[F]or an official to be liable for another actor's depriving a third party of his constitutional rights, that official must have at least the same level of intent as would be required if the official were directly to deprive the third party of his constitutional rights." *Id.* at 890–91 (quoting *Lacey v. Maricopa County*, 693 F.3d 896, 916 (9th Cir. 2012)).

Sullivan initially participated in the mass arrest by advancing with Tactical Team officers on 18th Street from the east. ECF No. 122-25 (Sullivan Decl.) ¶ 30. His exact role and location after that is not clear from the record in this case,[29] but he was involved in completing the mass arrest on 17th Street. *See id.* ¶ 31 ("The group continued to move together up to 17th, at which point we were finally able to encircle and arrest them."). Defense counsel stated at the hearing that Sullivan directed some of the officers involved in the arrest on 17th Street, and that he was in a position to see who was there at that time. ECF No. 139 at 4:12–5:16, 6:17–22.

Sullivan states in his declaration that he believed the group arrested was the same group that had previously failed to comply with orders to disperse on Church Street, and that he believed there was probable cause to arrest them based on both that conduct and unspecified "conduct at 18th and Dolores." ECF No. 122-25, ¶ 28; *see also id.* ¶¶ 19–25; ECF No. 131-3 at 5–7 (Sullivan Dep. at 23:7–25:11). Sullivan was able to observe at least some of the activity on 18th Street preceding the arrest, ECF No. 122-25, ¶ 25, and he spoke with Harvey before Harvey issued the arrest order that does not seem to have included any guidance for differentiating bystanders from lawbreakers, *id.* ¶ 27. Sullivan also testified that, at some point in the lead-up to the arrest, he instructed officers not to detain some people he believed lived in the area. ECF No. 131-3 at 8 (Sullivan Dep. at 26:2–17).

Sullivan was therefore meaningfully involved both in the execution of the mass arrest and in decisions as to whom to arrest. The Court has little trouble concluding that he was an integral participant. If a jury determines that the entire crowd people on 18th Street shortly before the arrest was not, as a unit, violating the law, and that Defendants did not have reasonable grounds to

[29] The Court does not rely here on the factual record presented in the related *J.T.* case, which includes even greater evidence of Sullivan's involvement.

believe that all of those people had come from the previous unrest and dispersal orders on Church Street, a jury could reasonably conclude that Sullivan knew or should have known that the mass arrest lacked probable cause.

For generally the same reasons as Captain Harvey, Sullivan is not entitled to qualified immunity on Plaintiff's unreasonable seizure claim under § 1983. Sullivan's declaration indicates that he conducted the mass arrest based on his belief that everyone arrested was involved in illegal activity both on Church Street and on 18th Street. As addressed in more detail above, the reasonableness of those determinations will depend on the resolution of factual issues that are disputed or unclear from the current factual record. Depending on how those issues are resolved, a jury might determine that Sullivan's involvement in the mass arrest violated the clearly established law that mere proximity to suspected lawbreakers does not establish probable cause. *See Ybarra*, 444 U.S. at 91; *Sibron*, 392 U.S. at 62.

Both parties' Motions for Summary Judgment are therefore DENIED as to Plaintiffs' false arrest and unreasonable seizure claims against Sullivan, to the extent that Plaintiff seeks to hold Sullivan liable as an integral participant.

**6. Supervisory Liability**

"Although there is no pure *respondeat superior* liability under § 1983, a supervisor is liable for the acts of his subordinates if the supervisor participated in or directed the violations, or knew of the violations of subordinates and failed to act to prevent them." *Vazquez v. County of Kern*, 949 F.3d 1153, 1166 (9th Cir. 2020) (cleaned up). A supervisor can be held liable under § 1983 based on "(1) his or her personal involvement in the constitutional deprivation, or (2) a sufficient causal connection between the supervisor's wrongful conduct and the constitutional violation," including "for his own culpable action or inaction in the training, supervision, or control of his subordinates; for his acquiescence in the constitutional deprivation; or for conduct that showed a reckless or callous indifference to the rights of others." *Starr*, 652 F.3d at 1208. "The requisite causal connection can be established by setting in motion a series of acts by others or by knowingly refusing to terminate a series of acts by others, which the supervisor knew or reasonably should have known would cause others to inflict a constitutional injury." *Rodriguez v.*

*County of Los Angeles*, 891 F.3d 776, 798 (9th Cir. 2018) (cleaned up).

Plaintiff asserted supervisory liability claims against Harvey and Sullivan (as well as Scott, who has now been dismissed as a defendant). SAC ¶¶ 41–44. At the hearing, Plaintiff did not oppose summary judgment on this claim against Sullivan and agreed to dismiss that claim, stating that discovery did not bear out his original "belie[f] that [Sullivan] was on equal footing with Harvey in directing the group." ECF No. 139 at 34:22–35:12. Based on the record presented in this case and Plaintiff's counsel's concession at the hearing, Defendants' Motion for Summary Judgment is therefore GRANTED as to the theory of supervisory liability against Sullivan.

Plaintiff characterized his supervisory liability claim against Harvey as "essentially the same claim" as the theory that Harvey is liable under § 1983 as the officer responsible for Plaintiff's arrest. *Id.* at 34:11–21. Neither party has identified any relevant distinction between those theories as applied to the facts of this case. To the extent Defendants argued in their briefs that the supervisory liability claim fails because Plaintiff did not identify specific Doe Defendants under Harvey's command, they cite no authority for such a requirement. ECF No. 122 at 29–30; ECF No. 134 at 18. Defendants' assertion that "Plaintiff does not identify any supervisory conduct by . . . Captain Harvey or attempt to show this conduct caused a subordinate's violation," ECF No. 134 at 19, fails to address the basic theory of liability on Plaintiff's unreasonable seizure claim: that Harvey was in command of the police response, ordered the mass arrest, and appears to have provided no guidance to his subordinates to differentiate lawbreakers from bystanders, *see* ECF No. 119-2 at 8–9 (Harvey Dep. at 235:17–236:8). Those facts are undisputed; only the reasonableness of Harvey's decision and approach is in question.

Defendants did not pursue any distinct arguments regarding the supervisory liability claim at the hearing, nor did they object to either Plaintiff's characterization of it as "essentially the same claim" as his underlying unreasonable seizure claim or the Court's view that they rise or fall together. *See* ECF No. 139 at 34:11–21. Both parties' motions are DENIED as to the supervisory liability claim against Harvey for the same reasons discussed above with respect to the unreasonable seizure claim.

**B. Excessive Force and Battery Claims**

The Fourth Amendment prohibits the use of excessive force in making an arrest. "In assessing the objective reasonableness of a particular use of force, [courts] consider: (1) the severity of the intrusion on the individual's Fourth Amendment rights by evaluating the type and amount of force inflicted, (2) the government's interest in the use of force, and (3) the balance between the gravity of the intrusion on the individual and the government's need for that intrusion." *Lowry v. City of San Diego*, 858 F.3d 1248, 1256 (9th Cir. 2017) (cleaned up). The government's "interest is assessed by considering three primary factors: (1) the severity of the crime at issue, (2) whether the suspect posed an immediate threat to the safety of the officers or others, and (3) whether the suspect was actively resisting arrest or attempting to evade arrest by flight," as well as any other factors that might be appropriate under "the totality of the circumstances." *Id.* at 1257 (cleaned up). "[W]hether the suspect posed an immediate threat to the safety of the officers or others[] is the most important single element of the three specified factors." *Id.* at 1258 (cleaned up).

"A state law battery claim is a counterpart to a federal claim of excessive use of force." *Brown v. Ransweiler*, 171 Cal. App. 4th 516, 527 (2009). Except for the application of qualified immunity to the federal claim, neither party has raised any distinction between Plaintiff's excessive force claim under § 1983 and his battery claim under state law. The Court therefore addresses those together.

"A series of Ninth Circuit cases has held that tight handcuffing can constitute excessive force." *LaLonde v. County of Riverside*, 204 F.3d 947, 960 (9th Cir. 2000) (citing *Palmer v. Sanderson,* 9 F.3d 1433 (9th Cir. 1993); *Hansen v. Black,* 885 F.2d 642 (9th Cir. 1989)). The viability of such claims has been "well-established" for many years. *See Wall v. County of Orange*, 364 F.3d 1107, 1112 (9th Cir. 2004). The Ninth Circuit has characterized tight handcuff claims as "usually fact-specific and . . . likely to turn on the credibility of the witnesses." *LaLonde*, 204 F.3d at 960; *see also Torres v. City of Madera*, 648 F.3d 1119, 1124 (9th Cir. 2011) ("Determining the reasonableness of an officer's actions is a highly fact-intensive task for which there are no per se rules."). When the facts asserted by a plaintiff leave it "difficult, if not

impossible, to say that the only reasonable conclusion that the evidence permits is that the force used was reasonable," the claim should be decided by a jury. *LaLonde*, 204 F.3d at 960. The Court addressed the standard for such claims and applicable precedent at length in previous Order on Defendants' Motion to Dismiss the Second Amended Complaint. ECF No. 94 at 9–15.

The parties agree that the Ninth Circuit's unpublished decision in *Reyes v. City of Santa Ana*, 832 F. App'x 487 (9th Cir. 2020),[30] sets an applicable standard that plaintiffs bringing such claims must either show that they "suffered more than nominal injuries from their handcuffs, or [that they] complained to police about tight handcuffs, only to have their requests for loosening ignored." 832 F. App'x at 491. The Ninth Circuit has held that evidence of an officer's failure to loosen handcuffs in response to a detainee's complaint of pain that left bruising, "if credited, would establish that [the officer's] use of force was excessive in violation of the Fourth Amendment." *Palmer v. Sanderson*, 9 F.3d 1433, 1436 (9th Cir. 1993); *see also* ECF No. 94 at 13.

Plaintiff relies on the theory that Solomon ignored Plaintiff's repeated requests to loosen his handcuffs. Defendants contend that Solomon did not ignore Plaintiff because he checked the handcuffs and determined that they were not too tight. As the Court noted in a previous Order, "merely looking at handcuffs without loosening them provides no relief to a detainee suffering pain and numbness." ECF No. 94 at 16. The video evidence also reflects that Solomon failed to respond at all to Plaintiff's initial complaint that the handcuffs were cutting off his circulation around 12:39 a.m., or to his reported loss of feeling around 12:48, and that Solomon only checked the cuffs somewhat later around 12:55 a.m. in response to further complaints by Plaintiff and another detainee. Solomon Decl. Ex. 18.

If a jury credits Plaintiff's testimony that his handcuffs were so tight as to cause pain, bruising, and numbness, ECF No. 119-4 at 131–33 (Pl. Dep. at 129:9–131:8), the jury might infer that Solomon knew or should have known that the handcuffs were too tight and nevertheless failed

[30] Defendants erroneously cite in one instance the Fifth Circuit's unpublished and apparently unrelated summary affirmance *Sierra v. Reyes*, 832 F.2d 1263 (5th Cir. 1987), but include a pin citation and subsequent short citation to the Ninth Circuit's *Reyes* decision at issue. ECF No. 122 at 31. The reason for the error is unknown, but the error itself is immaterial.

to intervene by loosening or reapplying them. If so, Solomon's conduct violated clearly established Ninth Circuit law interpreting the Fourth Amendment, and he is not entitled to qualified immunity. *See Palmer*, 9 F.3d at 1436.

Defendants assert that *Palmer* did not actually "find[] a Fourth Amendment violation," as the Ninth Circuit has held is ordinarily necessary for a case to defeat qualified immunity. ECF No. 134 at 23–24 (quoting *Smith v. Agdeppa*, 81 F.4th 994, 1008 (9th Cir. 2023)) (alteration in original). But a close reading of *Smith* shows that "finding a violation" is a flexible procedural requirement that is calibrated according to the posture of the case. In reversing a denial of qualified immunity, the *Smith* court factually distinguished four previous Ninth Circuit decisions. *Smith*, 81 F.4th at 1007. One of those affirmed a district court's order denying a motion to dismiss based on qualified immunity, holding that "the facts . . . as they are set forth in [the operative] Complaint" showed an unreasonable use of force. *Harris v. Roderick*, 126 F.3d 1189, 1192 (9th Cir. 1997); *see id.* at 1203–04. Another affirmed a denial of summary judgment because "a reasonable jury could conclude . . . that [the] use of deadly force . . . was not objectively reasonable." *Est. of Lopez ex rel. Lopez v. Gelhaus*, 871 F.3d 998, 1011 (9th Cir. 2017). The remaining two cases reversed orders granting summary judgment. *S.R. Nehad v. Browder*, 929 F.3d 1125, 1139 (9th Cir. 2019) ("Viewing the evidence in the light most favorable to Appellants, . . . a rational trier of fact could find that [the] use of deadly force was objectively unreasonable.") *Gonzalez v. City of Anaheim*, 747 F.3d 789, 797 (9th Cir. 2014) ("[W]e cannot say that a verdict in favor of the defendants on the claim for excessive force is the only conclusion that a reasonable jury could reach.").

In *Palmer* the court determined, based on certain facts, that a jury reasonably could find at trial that a Fourth Amendment violation occurred. *See Palmer*, 9 F.3d at 1436. All four of the cases distinguished in *Smith* similarly held that specific facts, if proven, *would* establish a violation, even though none of them reached a final decision that any defendant violated the Fourth Amendment. If, as Defendants now contend, that rendered them procedurally incapable of defeating qualified immunity under *Smith*, then *Smith*'s approach of distinguishing them based on their facts would make no sense. The Court is aware of no authority holding that such decisions

on interlocutory appeals cannot defeat qualified immunity when they clearly articulate the allegations or potential interpretation of the facts that would establish a violation if proven at trial.

The Supreme Court's recent decision in *Zorn v. Linton*, 607 U.S. 568 (2026) (per curiam), which Defendants identified after the hearing in this case in a statement of recent decision,[31] is not to the contrary. The Supreme Court held there that the Second Circuit erred in relying on one of its earlier cases to deny qualified immunity on a claim that a "rear wristlock" police compliance technique violated the Fourth Amendment. The Court stated that the earlier case—reversing summary judgment and remanding for a jury trial—"never 'held' that such conduct alone 'violated' the Fourth Amendment," but instead "implied the opposite." 607 U.S. at 573. The Court emphasized that the earlier case was factually distinguishable in that it involved a much "wide[r] range of allegations of excessive force." *Id.* at 572.[32] The Supreme Court was not presented with a case like *Palmer*, which clearly indicated that the facts as presented by a plaintiff "would establish that [a particular] use of force was excessive in violation of the Fourth Amendment." *Palmer*, 9 F.3d at 1436. This Court therefore does not understand *Zorn* as holding that *Palmer* inherently cannot defeat qualified immunity because of its posture affirming denial of summary judgment rather than conclusively finding a violation of the Fourth Amendment.

Of course, under both *Zorn* and previously existing law, *Palmer* would not be sufficient to defeat qualified immunity if its facts were materially distinguishable from this case. Defendants seek to distinguish *Palmer* on multiple factual grounds.

First, Defendants note that the plaintiff in that case suffered "pain and bruises that lasted for several weeks," which was longer than Plaintiffs' injuries lasted here. ECF No. 134 at 24 (quoting *Palmer*, 9 F.3d at 1436). As this Court noted in a previous Order, Solomon cannot claim qualified immunity based on distinctions in the duration of subsequent injuries, which he would

---

[31] Defendants' administrative leave to file their statement of recent decision is GRANTED, and the statement is deemed filed. *See* ECF No. 153.

[32] The other case cited in Defendants' statement of recent decision, *Fuhr v. City of Seattle*, applied *Zorn* to hold that precedent that was factually distinguishable from the case before that court did not overcome qualified immunity. 175 F.4th 1081, 1085–86 (9th Cir. 2026). As discussed below, *Palmer* is not materially factually distinguishable from the case at hand, so *Fuhr* does not alter this Court's analysis.

have no reliable way to predict on the night in question. ECF No. 94 at 14–15.

Next, Defendants argue that the officer in *Palmer* was conducting an individual arrest after a traffic stop rather than engaging in crowd control involving "risks to officer and public safety." *Id.* at 24. Viewing the facts in the light most favorable to Plaintiff, however, a jury could reasonably determine that there was no material safety risk at the time Plaintiff complained about his handcuffs several hours after the earlier unrest, when the detainees were cooperating and chatting with Solomon and other officers. The video evidence also does not suggest that Solomon was too busy at that time to adjust or reapply Plaintiff's handcuffs. "If all that was needed . . . was to call the situation unique, then . . . qualified immunity would always apply. The question is not whether we have precedent addressing the same facts, but whether a reasonable officer would know if the conduct was justified." *Hill v. City of Fountain Valley*, 70 F.4th 507, 526–27 (9th Cir. 2023) (Tashima, J., concurring in part and dissenting in part). If a jury does not find a meaningful difference in risk, demands on the arresting officers' time or attention, or other considerations that might be relevant to whether Solomon could have adjusted Plaintiff's handcuffs, then *Palmer* would suffice to "place[] the . . . constitutional question beyond debate" even though it did not address precisely the same facts. *See Ashcroft*, 563 U.S. at 741.

Defendants also suggest that *Palmer* only requires an officer to check detainee's handcuffs in response to a complaint, but not to adjust them if they are so tight that they cause unnecessary pain. ECF No. 134 at 24. That is an absurd reading of that decision, which would render the right recognized therein functionally meaningless. No reasonable officer could expect that even though the Fourth Amendment requires officers (at least under some circumstances) to check a detainee's handcuffs when a detainee complains of pain, it allows them to take no further action even if they determine that the handcuffs are unreasonably tight.

Finally, Defendants argue that *Palmer*'s own qualified immunity analysis "is out of step with Supreme Court authority of more recent decades," ECF No. 134 at 24–25, but the Court here relies on *Palmer* as a precedential decision recognizing Plaintiff's right under the Fourth Amendment to relief from painfully tight handcuffs that he brought to an officer's attention, not for its discussion of how to apply qualified immunity.

United States District Court
Northern District of California

Of course, a jury also might not credit all of Plaintiff's testimony regarding his injuries, and it might credit Solomon's testimony that he "determined that the flex-cuffs were appropriately tight." ECF No. 122-45, ¶ 54. If a jury determines that Plaintiff's handcuffs were no tighter than was reasonable, or that Solomon reasonably investigated their tension and reasonably believed they were not so tight as to cause unnecessary pain, Plaintiff would not be able to prevail on these claims. Those are factual questions to be resolved at trial.

Defendants' Motion could perhaps be read as arguing that the violence earlier in the evening would justify a decision not to adjust painfully tight handcuffs, causing bruising and a loss of circulation, even if Solomon observed or should have observed that the handcuffs were that tight when Plaintiff complained to him. *See* ECF No. 122 at 33. If that is Defendants' argument, a jury might reasonably disagree that the circumstances at the time of the handcuffing justified that continued use of force, when Plaintiff and the other young detainees were subdued, generally complying with officers' instructions, and engaging in lighthearted conversation with them. *See also, e.g.*, Solomon Decl. Ex. 18 at 1:29:51 a.m. (Solomon later telling some of the detainees that he "appreciate[d] you guys being chill for the most part").

Defendants' Motion for Summary Judgment is therefore DENIED as to Plaintiff's excessive force claim under § 1983 against Solomon, and as to his battery claims against Solomon and the City. Plaintiff did not move for summary judgment on these claims.

### C. Bane Act Claim

California's Bane Act, section 52.1 of the Civil Code, "provides a cause of action for violations of a plaintiff's state or federal civil rights committed by threats, intimidation, or coercion." *Reese v. County of Sacramento*, 888 F.3d 1030, 1040 (9th Cir. 2018) (citation and internal quotation marks omitted). The statute requires "a specific intent to violate the [plaintiff's] right," *Cornell v. City & County of San Francisco*, 17 Cal. App. 5th 766, 801 (2017), but the Ninth Circuit has held that a showing of "reckless disregard for a person's constitutional rights" can meet that standard, *Reese*, 888 F.3d at 1045. The "right at issue" must be "clearly delineated and plainly applicable under the circumstances of the case." *Sandoval v. County of Sonoma*, 912 F.3d 509 (9th Cir. 2018) (quoting *Cornell*, 17 Cal. App. 5th at 803).

The Bane Act's requirement of "threats, intimidation, or coercion" do not require additional conduct beyond an underlying violation that is itself a form of coercion. *Reese*, 888 F.3d at 1043–44 & n.5. The underlying violations of the Fourth Amendment that Plaintiff asserts here—wrongful arrest and excessive force—are inherently coercive and thus satisfy that element of the statute.

Defendants also dispute whether Plaintiff can meet this statute's intent requirement. At the hearing, defense counsel relied on *Sandoval* as holding that a violation of the Fourth Amendment does not necessarily satisfy that element of the claim. That case turned on the court's recognition that "it was legally unclear whether the 30-day [vehicle] impounds [at issue] were 'seizures' at all within the meaning of the Fourth Amendment" during the events in question, so the right at issue—as applied to the case—was not sufficiently clearly delineated. *Sandoval*, 912 F.3d at 520. In the absence of such legal uncertainty regarding underlying rights, however, at least one decision from this district has held that a lack of probable cause to arrest is enough to show reckless disregard, at least to avoid dismissal under Rule 12(b)(6). *Mehta v. City of Sunnyvale*, No. 23-cv-03193-PCP, 2024 WL 950165, at *5 (N.D. Cal. Mar. 5, 2024). "[I]t is not necessary for the defendants to have been thinking in constitutional or legal terms at the time of the incidents" in order to establish "a reckless disregard for a person's constitutional rights." *Reese*, 888 F.3d at 1045 (cleaned up).

Here, at least some of the potential violations of Plaintiff's rights were sufficiently clearly delineated to guide Defendants' conduct, and to support a potential finding of reckless disregard if they failed to comply with them. Officers cannot establish probable cause based on a suspect's mere proximity to a lawbreaker. *Ybarra*, 444 U.S. at 91; *Sibron*, 392 U.S. at 62. To the extent officers make mass rather than individualized determinations of probable cause to arrest, such cause must be based on "a reasonable belief that the entire crowd is acting as a unit and therefore all members of the crowd violated the law." *Lyall*, 807 F.3d at 1194 (quoting *Carr*, 587 F.3d at 408). If a jury finds that Captain Harvey and Lieutenant Sullivan effectuated a mass arrest without reasonable grounds to believe that all arrestees broke the law and without making reasonable efforts to avoid or minimize the likelihood of arresting bystanders, the jury might conclude that

United States District Court
Northern District of California

they acted with reckless disregard to those rights.

Some aspects of those officers' testimony could support such an inference. Harvey, for example, testified that he did not give any orders for the crowd to disperse from 18th Street because he believed "the time for 'I'm asking' was over once the riot happened." ECF No. 119-2 at 20–21 (Harvey Dep. at 277:22–278:21). Though it is by no means the only permissible understanding of that testimony, a jury might conclude that Harvey's understandable frustration with multiple hours of violent and disorderly conduct earlier at other locations led him to disregard the rights of the more peaceful crowd on 18th Street. Sullivan testified that, at some points in the evening, he let certain people go who he believed lived in the area, including on Church Street. ECF No. 131-3 at 8 (Sullivan Dep. at 26:2–17). A jury might—or might not—infer that, if Sullivan recognized that some innocent people had been caught up in even the more disorderly Church Street crowd, then Sullivan acted with reckless disregard to the possibility that the 18th Street crowd also contained bystanders who were nevertheless arrested.

As for Plaintiff's excessive force theory, the video evidence shows that Solomon quickly checked Plaintiff's handcuffs after Plaintiff's multiple complaints that they were too tight. Viewing the factual record in the light most favorable to Plaintiff, his handcuffs at that time were so tight that they caused pain, loss of circulation, and later bruising. A jury that reached those conclusions might—or might not—reasonably infer that Solomon acted with reckless disregard to Plaintiff's rights by conducting only a cursory inspection that was not sufficient to assess how tight the cuffs were, or perhaps by recognizing that they were too tight but failing to provide relief.

Defendants also argue that Plaintiff's Bane Act claim, as pled in his Second Amended Complaint, rested specifically on a theory of conspiracy, which is not supported by the evidence. ECF No. 122 at 34–35 & n.10; ECF No. 134 at 25. The portion of the Second Amended Complaint on which Defendants rely reads as follows: "By their conduct described herein, Defendants SCOTT, HARVEY, SULLIVAN, SOLOMON, and DOES 1-50, *acting in concert/conspiracy*, as described above, violated Plaintiff's rights under California Civil Code § 52.1." SAC ¶ 47. The Court does not construe that phrase as materially limiting the scope of Plaintiff's claim, particularly where the other allegations and claims in the Second Amended

Complaint sufficiently put Defendants on notice of Plaintiff's theories of underlying violations that do not depend specifically on proving a conspiracy.

Defendants' Motion for Summary Judgment is therefore DENIED as to Plaintiff's Bane Act claim, except with respect to the Defendants whom Plaintiff has agreed to dismiss from the case.[33] Plaintiff did not seek summary judgment on this claim. *See generally* ECF No. 118.

**D. Negligence Claim**

The parties agree that Plaintiff's negligence claim rises or falls with his Fourth Amendment claims discussed above. ECF No. 122 at 36–37; ECF No. 132 at 31–32. Defendants' Motion for Summary Judgment is therefore DENIED as to this claim, except with respect to the Defendants whom Plaintiff has agreed to dismiss from the case. Plaintiff did not seek summary judgment on his negligence claim. *See generally* ECF No. 118.

## VI. CONCLUSION

Defendants' Motion for Summary Judgment and Plaintiff's Motion for Summary Judgment are each GRANTED in part and DENIED in part, as discussed above.

**IT IS SO ORDERED.**

Dated: September 30, 2026

LISA J. CISNEROS
United States Magistrate Judge

[33] Defendants' Motion addresses two theories of Bane Act violation mentioned in Plaintiffs' Complaint, retaliation for exercising First Amendment rights and denial of parental contact, ECF No. 122 at 36, that Plaintiff does not pursue in his opposition brief, *see* ECF No. 132 at 30–31. To the extent those theories might otherwise remain at issue in the case, the Court also GRANTS summary judgment in favor of Defendants on those theories for the reasons stated in Defendants' Motion and based on Plaintiff's failure to oppose.